573 S.E.2d 812

**The STATE, Respondent,**

v.

**Dale F. FOLLIN, Appellant.**

**No. 3559.**

Court of Appeals of South Carolina.

Heard Sept. 12, 2002.

Decided Oct. 28, 2002.

Rehearing Denied Dec. 19, 2002.

238

M.M. Weinberg, Jr., and M.M. Weinberg, III, of Sumter, for Appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Robert E. Bogan, Chief Attorney, State Grand Jury, all of Columbia, for Respondent.

ANDERSON, J.:

Dale F. Follin was convicted of aiding and abetting embezzlement, conspiracy, and obtaining goods and services by false pretenses. She was sentenced to ten years, suspended upon the service of four years and five years probation, for aiding and abetting embezzlement. On the conspiracy charge, she was sentenced to three years, to run concurrent with the aiding and abetting sentence. She was sentenced to three years for obtaining property by false pretenses, to run concurrently with the other sentences.

Follin argues on appeal that the trial court: (1) lacked subject matter jurisdiction; (2) punished her for exercising her right to a jury trial; (3) erred in denying her motion for judgment notwithstanding the verdict and motion in arrest of judgment as to the charges of criminal conspiracy, aiding and abetting embezzlement, and obtaining goods and services by false pretenses; and (4) erred in denying her motions for directed verdict as to the charges of criminal conspiracy, aiding and abetting embezzlement, and obtaining goods and services by false pretenses. We affirm.

## *FACTS/PROCEDURAL BACKGROUND*

The charges against Follin stemmed from an investigation into the diversion of nearly $2.5 million from Sumter County School District 17 (District 17) by Adolph Joseph Klein, the Assistant Superintendent in charge of Financial Affairs for District 17. Follin, a travel agent and owner of Follin Travel, handled the travel arrangements for District 17 from 1988 to 1997. Follin dealt exclusively with Klein. She made a commission on every trip she booked which was actually taken.

Klein had two methods of diverting funds. First, with the assistance of James Benjamin "Benji" Adams, Klein directed over $1.5 million of District 17 funds as payment to fraudulent corporations created by Adams. Klein's second scheme involved having District 17 pay for nearly $1.5 million in personal travel expenses for Klein, his friends, and his family to travel to Mardi Gras, to go skiing in Colorado, to go on cruises, and to go to various sporting events around the country. As part of his travel scheme, from 1987 to 1995, Klein booked luxury vacations, which he termed "junket travel," through Follin for himself, friends, and people from out of state. He then filed a requisition of funds form with District 17, which appeared to request payment for legitimate District 17 business. No invoice for this travel existed. After District 17 issued a check to Follin Travel without an invoice number listed on it, Klein attached a note instructing Follin to apply those funds to an invoice number representing Klein's junket travel.

In 1995, Klein learned that if travel plans made one week were cancelled before the Friday of that same week, no payment would be required on the trip, the invoice would be voided, and the invoice number would no longer appear in Follin's computerized accounting system. He began using invoices to get District 17 to pay for his junket travel. Klein would request an invoice from Follin for what appeared to be legitimate travel for a school group or a District 17 employee. Klein would then request that Follin void the invoice prior to the Friday of that week. Follin would cancel the trip in her computer and stamp "void" on her copy of the invoice. However, Klein submitted his clean copy of the invoice to District 17 for payment. Klein called these invoices "special invoices"

for the junket travel. After the check was issued to Follin on the special invoice, Klein would attach a note to the check identifying for Follin the invoice number to which she should apply the check. The invoice number did not match the number on the special invoice submitted to District 17 for payment but matched the invoice number of another of Klein's junket trips.

Philip K. Davis, the accountant for District 17, assisted Klein in his scheme by not reporting the payments for junket travel. However, Davis' accounting firm's contract with District 17 ended after the 1994–95 school year and a new accounting firm was hired. Klein, as the person in charge of the district's financial matters, had sole approval of invoices and access to the check-signing machine, which generated his and the superintendent's signatures on the checks. Thus, the checks had the appearance of being approved by both parties.

The investigation began in September 1997 when District 17 officials learned that Klein approved travel and funding for School Board member Ione Dwyer to travel to New York to watch the chorus perform. Because the School Board had previously refused Dwyer's request for funding, District 17 Superintendent Dr. Andrena Ray investigated Klein. The investigation revealed that Klein approved invoices requesting travel funds for school groups and individuals working within District 17. However, after questioning the sponsors of the school trips, Dr. Ray learned that, despite the fact that District 17 paid Follin Travel for the trips, many of the school groups never went on the trips. An auditor began reviewing Klein's travel files for 1997.

Klein learned of the audit and contacted Follin at her home on a Sunday in October 1997. The two met at Follin's office. At Klein's request, Follin created false, back-dated records which indicated that District 17 was owed a credit of approximately $70,000 because several of the school-related trips paid for by the district were cancelled. Klein and Adams later delivered several cashier's checks to Follin totaling $52,000. Follin put the cashier's checks in her safety deposit box at her bank.

Sumter High School Principal Kay Raffield and District 17 attorney Bruce Davis went to Follin's business to discuss

various invoices amounting to nearly $70,000 for school trips in 1997 that were never taken. Follin admitted District 17 had a $70,000 credit. She told Raffield and Davis that whenever a trip was paid for but later canceled, Klein would inform her to keep the money as a credit towards future District 17 travel. Follin agreed to give the money back to District 17 but informed Davis that she did not have access to it at the moment because it was in a separate account. After the meeting, Follin retrieved the cashier's checks from her safety deposit box and deposited them into her business account. District 17 did have a legitimate credit owed to them from Follin Travel. However, the cashier's checks and the genuine credit did not amount to the $70,000 owed to the district. Thus, Follin transferred $17,000 from her grandmother's IRA account to her business account. She then wrote District 17 a "refund" check of $70,389.10.

After further investigation, Klein, Follin, and other individuals connected to the scheme were indicted by the State Grand Jury. Klein and most of the other individuals charged in the scheme pled guilty to the charges. Follin proceeded to trial.

## *LAW/ANALYSIS*
### I. SUBJECT MATTER JURISDICTION

Follin argues the State Grand Jury[1] was without power to issue the indictments against her because the investigation lasted longer than two years and was transferred from one State Grand Jury to two subsequent State Grand Juries in violation of the statute. Thus, she asserts, the indictments were invalid and the trial court lacked subject matter jurisdiction. We disagree.

The extensive investigation by the State Grand Jury into this matter began in 1997 and numerous people were ultimately indicted for defrauding District 17. The investigation against Follin was before several different panels of the State Grand Jury. The 1998 State Grand Jury heard evidence in the case, but was discharged in 1999 before issuing an indictment. On October 13, 1999, Follin was initially indicted for criminal

---

1. Follin erroneously refers to this entity as the "Statewide Grand Jury." As clearly indicated in the statute, this judicial body is known as the State Grand Jury. *See* S.C.Code Ann. § 14–7–1600 (Supp.2001).

conspiracy by the 1999 State Grand Jury. The State Grand Jury issued a first superseding indictment on January 11, 2000, charging Follin with criminal conspiracy; larceny by trick; embezzlement; obtaining goods and services by false pretenses; receiving stolen goods; and obstruction of justice.

Follin, along with two co-defendants, moved to quash the indictment. She argued the General Assembly intended a particular State Grand Jury to investigate allegations of criminal conduct for up to two years before it must be discharged. Follin maintained the legislature did not intend for an investigation to be transferred from one grand jury to a successive grand jury if the initial panel could not issue an indictment upon an investigation. She complained the grand jury that heard her testimony on May 5, 1998, did not issue an indictment, and the subsequent grand jury which issued indictments in October 1999 and January 2000 did not hear her testimony. The trial court denied the motion to quash.

Follin contends the trial court erred in failing to find that the statute governing the State Grand Jury does not allow a subsequent grand jury to issue an indictment if the original grand jury failed to issue one at the expiration of its term.

■ Although there have not been any recent cases discussing the rules regarding the transfer of investigations to a subsequent county grand jury, the common law allows such transfers. In *Fitch v. State*, 11 S.C.L. (2 Nott & McC.) 558 (Ct.App.1820), the defendant appealed the referral of the investigation against him to a new grand jury after the initial grand jury returned a "no bill." The Court noted:

As a legal principle, there can be no doubt but that a prosecutor may prefer a new bill where a grand jury has returned "no bill." 4 Black. 305, is in point, and I have known no time when this practice in our courts has not prevailed. Blackstone says, that where the bill is returned, "not found," the party is discharged without farther [sic] answer. But a fresh bill may afterwards be preferred to a subsequent grand jury. There is no inconsistency in those sentences. He may be discharged from farther [sic] answer; but from what? The meaning is evident, from the bill which has been thus returned, not from the charge for which he was recognized to appear; on this, if essential to

public justice, a fresh bill may be given out. The proofs may have been defective on the first bill, and this deficiency may be supplied on the preferment of another. It is the verdict of a petty jury alone, which can operate as a discharge of the defendant from the accusation against him. If, on trial, they find the party not guilty, he is then, says Blackstone, forever quit and discharged of the accusation. The implication is clear, that before then he is not so discharged. It is not to be supposed that the solicitor, in the exercise of a discretion with which he is invested, would use it in an arbitrary or oppressive manner, nor would it be consistent with justice, that an offender should be permitted to withdraw himself from an accusation where, in the opinion of the solicitor, his guilt might be made to appear more fully before another grand jury.

*Fitch*, 11 S.C.L. at 559.

We must determine whether the legislature intended to abrogate this common law rule in enacting the State Grand Jury statute. To that end, we must ascertain the intent of the legislature and give the words of the statute their plain and ordinary meaning. *State v. Johnson*, 343 S.C. 693, 541 S.E.2d 855 (Ct.App.2001). "What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will." *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) (citation omitted).

The General Assembly created the State Grand Jury to detect and investigate multi-county crimes involving narcotics, dangerous drugs, controlled substances, obscenity, and crimes involving public corruption and election laws. S.C.Code Ann § 14–7–1610 (Supp.2001); *State v. Wilson*, 315 S.C. 289, 291, 433 S.E.2d 864, 866 (1993) ("The State Grand Jury was created to improve the State's ability to 'detect and eliminate' multi-county criminal activity. . . . To this end, the Grand Jury has statewide authority but its jurisdiction is limited to certain offenses.") (citation omitted). After the impaneling judge considers the Attorney General's petition and orders the impanelment, a State Grand Jury is impaneled for a term of twelve months. S.C.Code Ann. § 14–7–1630(B)(C) (Supp. 2001). Upon petition by the Attorney General, the chief administrative judge of the circuit in which the State Grand Jury was impaneled may order the term of that Grand Jury

extended for a six month period. S.C.Code Ann. § 14–7–1630(C) (Supp.2001). However, the total term of a particular State Grand Jury, including extensions, shall not exceed two years. *Id.*

The proceedings of the State Grand Jury are secret and a witness's testimony may not be disclosed by anyone except where directed by a court for the purpose of:

(1) ascertaining whether it is consistent with the testimony given by the witness before the court in any subsequent proceeding;

(2) determining whether the witness is guilty of perjury;

(3) assisting local, state, other state or federal law enforcement or investigating agencies, *including another grand jury,* in investigating crimes under their investigative jurisdiction;

(4) providing the defendant the material to which he is entitled pursuant to Section 14–7–1700;

(5) complying with constitutional, statutory, or other legal requirements or to further justice.

S.C.Code Ann. § 14–7–1720(A)(1)(5) (Supp.2001) (emphasis added).

The statute does not specify that a matter may be referred to subsequent grand juries for investigation. Unequivocally, the legislature intended to allow such referrals. Although the legislature limited the time period for which a single State Grand Jury may investigate a particular matter to two years, nothing in the statute purports to forbid a subsequent referral to another State Grand Jury or to limit the number of grand juries which may investigate a matter. The legislature granted prosecutors the authority to disclose matters before one State Grand Jury to a *subsequent* State Grand Jury to assist in the investigation. S.C.Code Ann. § 14–7–1720(A)(3) (Supp. 2001). This authority to disclose the secret information presented to one State Grand Jury to a subsequent State Grand Jury evidences the legislature's intent to allow the continuation of the common law practice of referring matters to subsequent grand juries when one fails to return an indictment at the end of its term.

Further credence is given to this view by referring to the federal rule regarding grand juries. Federal Rule of Criminal Procedure 6(e) is very similar to our statute regarding disclosure of secret information to subsequent grand juries. It provides that disclosure of the grand jury proceedings otherwise prohibited by the rules may be made "when the disclosure is made by an attorney for the government to another Federal grand jury." Fed.R.Crim.P. 6(e)(3)(C)(III). Where one federal grand jury returns a "no bill," prosecutors may submit the investigation to a subsequent grand jury after obtaining government approval. 24 James Wm. Moore *et al.*, *Moore's Federal Practice* § 606.01[2][b][iv] (3d ed.2002).

"At one time, it was regarded as potentially abusive for the prosecutor to submit a case to a second grand jury when a first refused to indict." *Id.* § 606.06[4][c]. "However, it is now regarded as acceptable practice. Presentation of an investigation to a second grand jury occurs most frequently *when the first grand jury's term has expired prior to completion of the investigation.*" *Id.* (emphasis added).

This position has been followed by the United States Court of Appeals for the Fourth Circuit. *See United States v. Penrod,* 609 F.2d 1092 (4th Cir.1979) (matter was referred to a second grand jury where first grand jury failed to indict); *see also United States v. Thompson,* 251 U.S. 407, 413, 40 S.Ct. 289, 292, 64 L.Ed. 333, 342 (1920) ("[T]he power and duty of the grand jury ... is continuous and is therefore not exhausted or limited by adverse action taken by a grand jury or by its failure to act, and hence may thereafter be exerted as to the same instances by the same or a subsequent grand jury.").

Other jurisdictions allow referral to subsequent grand juries, although some impose a statutory limit to the number of times a charge can be referred to a grand jury or require prosecutors to seek court approval prior to resubmitting the matter to the grand jury. *See, e.g., United States v. Contenti,* 735 F.2d 628 (1st Cir.1984) (holding it is acceptable to transfer an investigation to a subsequent grand jury where the original grand jury did not complete the investigation before the term ended); *United States v. Shane,* 584 F.Supp. 364 (E.D.Pa. 1984) (ruling transfer of investigation, without a court order, from one grand jury to another in the course of continuing in

the same investigation did not warrant dismissal of the indictment); *Ephamka v. Alaska,* 878 P.2d 647 (Alaska Ct.App. 1994) (stating prosecutor must seek court permission to resubmit a charge to a grand jury where the first grand jury failed to issue an indictment); *New Mexico v. Isaac M.,* 131 N.M. 235, 34 P.3d 624, 627 (Ct.App.2001) (declaring the state constitution "does not expressly limit the 'power of the district attorney either to resubmit a matter to a grand jury or to proceed by information after a grand jury has returned a no[-]bill' "); *People v. Gelman,* 93 N.Y.2d 314, 690 N.Y.S.2d 520, 712 N.E.2d 686 (1999) (holding statute was enacted to prevent abuse resulting from common law rule that prosecutor could repeatedly resubmit a charge to successive grand juries; it provided that a charge may only be resubmitted to a subsequent grand jury once).

Indubitably, the statute does not limit the number of times the State may submit a matter for investigation to the State Grand Jury. In contrariety, there is clear indication the legislature intended the State to have the ability to resubmit a matter to a subsequent grand jury, especially in cases such as this where the investigation is very complex. This interpretation comports with the verbiage of the statute, the common law, and federal law. Although Follin argues the legislature intended the two year term to mean that one State Grand Jury could not be dismissed until it had served an entire two years, we disagree. We do not read the statute that narrowly and reject this contention.

We hold the State Grand Jury has *subject matter jurisdiction* to issue indictments in factual scenarios involving:

(1) an investigation lasting longer than two years; or

(2) an investigation transferred from one State Grand Jury to a subsequent State Grand Jury.

## II. SENTENCING

[3] Follin maintains the trial court erroneously considered her exercise of the right to a jury trial by sentencing her more severely than the co-defendants who pled guilty. We disagree.

Klein pled guilty to several charges and was sentenced to a total of ten years imprisonment. Other individuals were indicted for their involvement with Klein's scheme. Benji Adams helped Klein create fraudulent corporations that provided no services to District 17, and Klein directed $1.5 million in District 17 funds to the corporations. Adams pled guilty to embezzlement as a principal in the second degree, principal in the first degree, and accessory before the fact of embezzlement. Adams received a sentence of ten years imprisonment, suspended on the service of three years and five years probation and restitution.

James A. Perry pled guilty to receiving stolen goods and conspiracy to commit embezzlement. He received a sentence of seven years imprisonment, suspended with five years probation and an obligation to pay $100,000 in restitution on the stolen goods charge. Perry was sentenced to five years, suspended with five years probation, on the conspiracy to commit embezzlement charge.

George Kurzenberger pled guilty to receiving stolen goods and was sentenced to three years imprisonment, suspended with five years probation, and restitution in the amount of $2,700.

George E. "Eddie" Myers pled guilty to official misconduct in office and was sentenced to five years imprisonment, suspended with five years probation and payment of $15,000 in restitution.

Troy Phillips pled guilty to official misconduct in office. He was sentenced to five years imprisonment, suspended with five years probation and payment of $18,000 in restitution.

Samuel G. Lovell, III, pled guilty to criminal conspiracy to commit official misconduct. He received a sentence of three years imprisonment, suspended with five years probation, and payment of $40,000 in restitution.

Mark J. Clifford pled guilty to receiving stolen goods and was sentenced to five years imprisonment suspended with five years probation and payment of $30,000 in restitution.

Edward Thomas Lewis pled guilty to criminal conspiracy, common law official misconduct in office, and receiving stolen goods. He received three years imprisonment suspended with

five years probation on the criminal conspiracy charge. Lewis was sentenced to ten years imprisonment on the official misconduct charge, suspended upon the service of ninety days with five years probation, plus restitution of $45,000. Lewis was sentenced to three years imprisonment suspended on five years probation for receiving stolen goods. The sentences ran concurrently.

Johnny M. Martin was charged with receiving stolen goods, common law official misconduct in office, and criminal conspiracy. He was found guilty of all three offenses after a jury trial. He was sentenced to concurrent terms of ten years, suspended upon the service of one year with five years probation and payment of $50,000 in restitution; ten years imprisonment, suspended upon five years probation; and five years, suspended upon five years probation, respectively.

James Michael Hicks pled guilty to official misconduct in office and receiving stolen goods. He was sentenced to concurrent terms of five years imprisonment, suspended upon five years probation and payment of $32,000 in restitution, and five years imprisonment, suspended upon five years probation, respectively.

Ellison Lawson, Jr., pled guilty to criminal conspiracy, common law official misconduct in office, and receiving stolen goods. He was sentenced to two years imprisonment, suspended with one year probation on the criminal conspiracy charge. Lawson received a concurrent sentence of two years imprisonment, suspended upon one year probation, on the official misconduct in office charge. He received a concurrent sentence of five years imprisonment, suspended with one year probation, on the charge of receiving stolen goods.

Philip K. Davis, the former accountant for District 17, was charged with criminal conspiracy; two counts of breach of trust with fraudulent intent; receiving stolen goods amounting to $48,000; receiving stolen goods amounting to $37,784; receiving stolen goods amounting to $45,635; and receiving stolen goods amounting to $34,166. Davis pled guilty to all the charges and was sentenced to five years imprisonment, suspended to five years probation, on the criminal conspiracy charge. He was sentenced to two concurrent terms of seven years, suspended upon the service of three years with five

250

years probation and restitution on the breach of trust charges. Davis was sentenced to four concurrent terms of seven years, suspended with five years probation on the four charges of receiving stolen goods.

In sentencing Follin, the trial judge noted she had been an asset to the community, and stated:

But none of those things in any way suggests to me that I should give you a straight probationary sentence because I can't, because there is no way in this world that I can view you in the same light that I view the persons that have been involved in the school. There were other forces at play on that.

I know that plenty of people in the community don't agree with that and I respect their right to think that. That's fine. But in this case, you are not at that level. You are—I agree you are not where Joe Klein is and you probably are not where Benji Adams was.

But as I mentioned in sentencing Johnny Martin and I have said throughout and I will continue to say I can't ignore Benji Adams admitting his guilt, and I am not punishing you and will not punish you for your jury trial in no way, shape or form, but I don't have an admission of guilt nor do I want one.

I'm not asking you for one. I'm not asking for—just simply saying that's not a factor for me to consider. I will consider your cooperation. I think you were very very instrumental in helping pull this together.

Follin received a sentence of three years on her conviction for criminal conspiracy. She was sentenced to ten years imprisonment, suspended upon the service of four years with five years probation and payment of $20,000 in restitution for her conviction of aiding and abetting embezzlement. Finally, Follin was sentenced to three years for her conviction of obtaining property by false pretenses. All sentences ran concurrently.

Follin filed a post-trial motion for reconsideration of her sentence. She claimed her sentence was disproportionate to the sentences received by others involved in the scandal. Further, Follin asserted that the trial judge, in imposing the sentences, improperly considered Follin's exercise of her right

to a jury trial in violation of *Davis v. State*, 336 S.C. 329, 520 S.E.2d 801 (1999).

The trial judge addressed the argument regarding the improper consideration of the defendant's failure to plead guilty at Johnny Martin's sentencing.[2] The judge referenced his reasoning given in the Martin hearing and the following exchange took place:

The Court: There's no need for me to restate that here. As I stated then in basically summary fashion I'll say, I do

2. The same judge presided over Martin's jury trial and sentenced him to three concurrent terms of ten years, suspended upon the service of one year and five years probation. At the hearing on Martin's motion for reconsideration, the trial judge noted that he was not punishing Martin for exercising his right to a jury trial, but he gave consideration to the others who pled guilty:

No one should be punished because they have exercised their right to have a trial by jury.

. . . .

It occurred to me in sentencing not as a punishment, but what do you use as a minimum sentence? How is that how can that be for the person who admits their guilt versus a person for trial? If everybody is to be treated the same, then we there would never be any distinction. And none of the case law that we have had or none of the things that we have all said throughout the practice of law would have no meaning at all.

. . . .

He didn't stand up and admit as the other persons did admit that I did something wrong and not only did I admit that I'm doing something wrong, but I admit and I'm willing to pay "X" number of dollars. Those are factors. . . .

If those aren't factors that a court should consider then the Supreme Court needs to come out and say so and I would urge them to do so. . . .

Restitution is a part of it. It's a part that I will consider.

. . . .

. . . I have to fashion a sentence given that set of circumstances, then I have to fashion a sentence for somebody that comes up and says I'm guilty, I admit my guilt, I'm wrong, and not only am I guilty but, Your Honor, I—I cost the State or I cost the victim in this situation "X" number of dollars and I want to repay that.

That is the distinction, not what he is saying to me, but that is the distinction that I have to determine. Is that person entitled to some consideration?

. . . .

. . . The other people got consideration for their sentence because they entered a guilty plea.

. . . .

. . . I gave credit for admitting guilt.

not, will never, and pray I never, I should say that, I hope I never—if I do I hope I'm reversed immediately, I should be—penalize a person for exercising something that I consider very dearly and that is those rights that are given to us as citizens of this country in the constitution and that to me is her right.

And I would not penalize her for that and nor have I done so.

As I stated and he—no question the court alludes to this same language in the *Davis* case. As I stated, and I incorporate the Martin [sic], I asked the court again, if I—if I as a trial judge in sentencing and fashioning a sentence am I not at liberty to consider in mitigation and in trying to mitigate the sentence the fact that a person admits their guilt and give some consideration for that, then tell me so.

Tell me I can't do that and I'll stop. I'll stop.

But as a trial lawyer and as a trial judge, I know as a trial lawyer for 21 years, that was the first thing. Judge, my client is standing before you admitting their guilt. That should—you should consider that and I ask for your mercy because they are admitting their guilt. They are admitting they are wrong.

I don't fault Ms. Follin for that. She chose to—and she made the statement and I don't fault the statement she made before sentencing because I believe her. I don't think she was telling an untruth. This is truly how she felt. And I understand that. I really do.

But my—what I had was a person a jury had convicted. I didn't have that factor to consider. I considered, as I've already stated, the limit or the extent of her participation in it in trying to fashion a sentence which I thought was just for both sides and just and proper.

And I didn't think it was—I frankly think it was fair and it had nothing to do with her—her exercising her jury right.

You have that position in this record and you have what is here before us and we'll see if need be what they—what they—persons who review this will say.

But I wish to state again, I did not consider that and penalize her for—for not pleading guilty or exercising her right to a jury trial.

Mr. Weinberg: Your Honor, just point of information, so I understand the court's ruling.

The Court stated in *Davis* or the trial judge stated in *Davis,* I'm quoting from the record, they admitted what they had done to me and that's the first step toward rehabilitation.

In other words, he was admitting—he was stating that they had admitted that—they stood before him and said what they did wrong. If that's what you're saying, if I can't do that anymore, tell me, is that—

The Court: I'm just saying to you that if that is volitive [sic] of *Davis,* if that is what the Court is saying, then we can never—and I asked [Martin's attorney], and I would ask you, in giving a guilty plea, do you expect the court to give credit or give some consideration for the fact that a person is admitting their guilt?

Mr. Weinberg: Judge, I think probably—probably pre-*Davis* we all did. But I think now—

The Court: So you think now that there's no need to state that before me now that I should consider the fact that a person is pleading guilty?

Mr. Weinberg: Whether you should or not, Judge, I don't know. I think the Supreme Court has said you can't.

The Court: All right. I appreciate that and we'll find out. But I don't think that's what they are saying. I think that in that case you're talking that language, and it was just like—it was just like I told [Martin's attorney]—when you're trying to argue it for Mr. [sic] Follin's back (sic) it's much easier—it's more difficult to explain than it is going the other way.

Because when you sit there and ask for some consideration I don't think the court has ever said that sentence ought to be overturned because you considered the fact that they pled guilty and you gave a sentence in giving consideration for admission of the guilt. That's not there.

This case there was indication and suggestion and there are other facts of that case that will suggest possibly, not just that language, that that judge may have in that situation imposed a stiffer sentence. And I wasn't there. Don't

know. I just know what the Supreme Court said he did. But thank you very much.

Your motion is noted and the *Davis* case is clearly there. I hope we framed it properly for review should that become necessary.

In recent years, our state appellate courts have addressed the problem of trial judges improperly considering the defendant's failure to plead guilty in imposing sentence. In *State v. Hazel*, 317 S.C. 368, 453 S.E.2d 879 (1995), the defendant was convicted of possession with intent to distribute crack cocaine. During the sentencing proceeding, the defendant requested a sentence under the Youthful Offender Act, and the trial judge noted:

Well, it's one thing if he'd pled guilty, I'd have considered that, but taking into consideration the age and where he was and the time it was, the sentence of the court is you be confined to the State Board of Corrections for a period of fifteen years and pay a fine of twenty-five thousand dollars.

*Id.* at 369, 453 S.E.2d at 879.

Our Supreme Court reversed the defendant's sentence, finding the trial judge improperly considered the defendant's exercise of his right to a jury trial. The Court recognized " '[c]ourts have long adhered to the principle forbidding a trial court from improperly considering the defendant's exercise of his constitutional right to a jury trial as an influential factor in determining the appropriate sentence.' " *Id.* at 370, 453 S.E.2d at 880 (citations omitted).

In *Davis v. State*, 336 S.C. 329, 520 S.E.2d 801 (1999), the defendant was convicted by a jury and later moved to have his sentence reduced. In denying the defendant's motion, the trial judge explained as follows:

Yes, Ma'am, but he didn't plead guilty. Those other two people, they pled guilty. They admitted what they had done and to me that's the first step towards rehabilitation is admitting that you did something wrong and you're pleading guilty and when a fellow wants a trial which he's entitled to as a matter of law—and that's fine.

*Id.* at 332, 520 S.E.2d at 802.

Davis moved for post-conviction relief based in part on trial counsel's failure to object when the trial judge considered

Davis's exercise of his right to a jury trial in sentencing. The Court held that Davis was entitled to relief because his trial attorney failed to object to the consideration placed upon his exercise of his constitutional right to a jury trial.

The issue has been addressed recently by this Court in *State v. Brouwer*, 346 S.C. 375, 550 S.E.2d 915 (Ct.App.2001). Brouwer and a co-defendant were employees of an adult video store. Both were charged with disseminating obscene materials. Brouwer was convicted. Pursuant to *Davis*, Brouwer asked the trial judge [3] to impose a probationary sentence similar to that imposed on his co-defendant who previously pled guilty to the same charge.[4] In denying the request and sentencing Brouwer to four years imprisonment, suspended upon the service of six months, and three years probation, the trial judge stated as follows:

[L]et me respond to your reference to the *Davis* case.... And you are talking about where the trial judge made a reference to the fact that because he exercised his right to a jury trial, now he has to impose a certain sentence.

What I indicated to you in chambers was simply what I indicate to anyone who is there. The court wishes to say that we are not going to have that involved, then let them do it and we will put it on the record in this case, and I welcome the instruction, because I see—I distinguish that *Davis* case from what I said, because I never said to you that if he exercises his right to a jury trial, I would punish him more severely. I said to you, as I recall, and I think I said, because I say it just about every time I talk to someone, I'm a judge that gives serious consideration for someone admitting their guilt. I think that's important. It was told to me when I first started practicing law years ago by Judge Clarence Singletary, who was the judge in my circuit, that I believe that that's the first step towards rehabilitation....

... [T]here is no way in rhyme or reason for us to ever give a sentence for someone pleading guilty the same sen-

---

3. The trial judge in the present case was the trial judge in *Brouwer*.

4. The co-defendant was sentenced to two years imprisonment plus a $5,000 fine, with the sentence suspended upon payment of $750 and two years probation.

tence for a jury trial. Then we have ignored the fact that a person has admitted their guilt.

Now, I don't think a person needs to be punished because of their jury trial, because that's a Constitutional Right. And I, as a trial judge, have never, nor will I ever, punish someone for exercising their right to a jury trial. I think that is something valuable. I take it very seriously.... But one of the factors that I will always consider, ... is consider someone who admits their guilt.

*Id.* at 396, 550 S.E.2d at 926–27 (Anderson, J., dissenting).

Despite the trial judge's comments that he would never punish someone for exercising his or her right to a jury trial, the majority opinion found the trial judge expressly violated *Davis* by improperly considering that fact during sentencing, "especially since the record fail[ed] to reflect an *otherwise appropriate basis for Brouwer's disparate sentence.*" *Id.* at 388, 550 S.E.2d at 922 (emphasis added).

In the case *sub judice,* Follin was sentenced to a period of incarceration longer than any of the other individuals charged in the case, with the exception of Klein. At first glance, it would appear that the trial judge violated the mandate found in *Brouwer* by referencing the fact that other defendants pled guilty in the case. However, the instant case is clearly distinguishable from *Brouwer.*

Brouwer and his co-defendant were in the same posture: both were employees of an adult video store, both were charged with the same crime, and both faced the same potential sentence. As emphasized by the majority opinion in *Brouwer,* nothing in the record indicated an appropriate basis for the disparity in the sentences actually given. *Id.* at 388, 550 S.E.2d at 922.

By contrast, there are very few similarities between Follin and the other defendants in this case. The defendants were not in the same posture with each other because they were not all employees of District 17, they were not all charged with identical crimes, and they faced different sentences.

Adams was the single most important individual in assisting Klein in his fake corporation scheme. He was charged with embezzlement in the first and second degree and accessory

before the fact and was sentenced to three years total incarceration. Davis, the accountant who assisted Klein in the fake travel scheme, pled guilty to criminal conspiracy, breach of trust, and receiving stolen goods. He was sentenced to a total of three years imprisonment. Aside from Davis, Follin was the most important individual in assisting Klein with the fake travel scheme. As Klein testified at Follin's trial, without Follin, he could not have effectuated the travel scheme. Although Follin received a sentence of four years imprisonment, instead of the three years Adams and Davis received, she was convicted of aiding and abetting embezzlement, obtaining a signature or property by false pretenses, and criminal conspiracy. Her sentence was well within the sentencing range for her convictions.[5]

It is regrettable that the trial judge in the present case commented on Adams's guilty plea and the consideration given to him for pleading guilty. However, the trial judge repeatedly noted that he was not considering Follin's exercise of her right to a jury trial in rendering her sentence. Further, Follin's charges and potential sentences were vastly different so as to render comparison to any other co-defendant difficult. Thus, unlike *Brouwer*, the record before us clearly indicates that the differences in the charges Follin faced led to the disparity in her sentence, not her decision to proceed with a trial.

We rule a sentencing judge may *NOT* improperly consider a defendant's decision to proceed with a jury trial. We conclude that, when the record clearly reflects an appropriate basis for a disparate sentence, the sentencing judge may impose a different sentence on a co-defendant in a criminal trial. We caution the Bench that a trial judge abuses

---

5. The sentence for conspiracy is no more than five years. S.C.Code Ann. § 16–17–410 (Supp.2001). The sentence for embezzlement of public funds is no greater than ten years where the amount of funds embezzled is $5,000 or more. If the amount is less than $5,000, the sentence shall be no more than five years. S.C.Code Ann. § 16–13–210(1)–(2) (Supp.2001). Finally, the sentence for obtaining a signature or property by false pretenses is no more than ten years where the property is valued at $5,000 or more. S.C.Code Ann. § 16–13–240(1) (Supp.2001).

his or her discretion in sentencing when the judge considers the fact that the defendant exercised the right to a jury trial.

## III. JUDGMENT NOTWITHSTANDING THE VERDICT (JNOV)

After her conviction, Follin moved for JNOV. She alleged the trial court erred by failing to grant her motion for directed verdict as to all of the charges. The trial judge denied the motions. Follin argues on appeal that the trial court erred in denying her motion for JNOV. We disagree.

JNOV is a post-trial motion challenging the sufficiency of the evidence to support the judgment. *See generally,* Rule 50(b), SCRCP. A motion for JNOV is a civil trial motion, and thus it is improper for a party to move for JNOV in a criminal trial. *State v. Miller,* 287 S.C. 280, 337 S.E.2d 883 (1985); *State v. Dasher,* 278 S.C. 395, 297 S.E.2d 414 (1982) (it was error of law for judge to direct verdict of not guilty in criminal case after jury had returned guilty verdict); *State v. Taylor,* 348 S.C. 152, 158, 558 S.E.2d 917, 919 (Ct.App.2001) (*cert. granted* May 30, 2002) (ruling "a motion for a JNOV in a criminal case is not recognized in this state.").

In criminal matters, a motion for a new trial is the "only available post-trial motion addressing the sufficiency of the evidence." *Miller,* 287 S.C. at 282 n. 2, 337 S.E.2d at 884 n. 2 (citing *State v. Dawkins,* 32 S.C. 17, 10 S.E. 772 (1890)); *see also State v. Scurry,* 322 S.C. 514, 518, 473 S.E.2d 61, 63 (Ct.App.1996) ("[I]n a criminal case, a motion for a new trial is the only available post-trial motion addressing the sufficiency of the evidence."). "There is no precedent that 'gives the trial court authority to change its mind after a guilty verdict has been returned and thereafter, on its own motion, grant a directed verdict of innocence as to the same charge.'" *Taylor,* 348 S.C. at 158, 558 S.E.2d at 920 (citation omitted).

Because a motion for JNOV is not recognized as a valid post-trial motion in criminal cases, Follin was not entitled to JNOV.

## IV. MOTION IN ARREST OF JUDGMENT

In post-trial motions, Follin made a motion in arrest of judgment as to her charges. In support of this motion, Follin first asserted the trial court erred in failing to direct a verdict as to the charge of aiding and abetting the embezzlement because there was no evidence that she was a principal in the embezzlement and she was not indicted as an accessory after the fact. Follin further contended there was insufficient evidence to support the charge of conspiracy, and there was no evidence of intent to defraud in order to support the charge of obtaining goods and services by false pretenses. We disagree.

 "A 'motion for arrest of judgment' is a postverdict motion made to prevent the entry of a judgment where the charging document is insufficient or the court lacked jurisdiction to try the matter." *State v. Taylor*, 348 S.C. 152, 160, 558 S.E.2d 917, 920–21 (Ct.App.2001) (*cert. granted* May 30, 2002). A defendant may make a motion for arrest of judgment alleging an insufficiency of the indictment. *Id.; see also State v. Brown*, 201 S.C. 417, 23 S.E.2d 381 (1942) (holding motion for arrest of judgment should have been granted where trial court did not have jurisdiction to impose the sentence); *State v. Jeter*, 47 S.C. 2, 24 S.E. 889 (1896) (concluding it was error for trial court to deny motion for arrest of judgment where indictment was insufficient). However, the defendant may not move for a verdict in arrest of judgment based on the insufficiency of the evidence to support the charges in the indictment. *Taylor*, 348 S.C. at 160, 558 S.E.2d at 921; *see also State v. Miller*, 287 S.C. 280, 286, 337 S.E.2d 883, 886–87 (1985) (Ness, J., concurring in part and dissenting in part) (stating a defendant "may *not* move for verdict in arrest of judgment based on the sufficiency of the evidence to sustain the allegations in the indictment.") (emphasis in original) (citation omitted). "[W]hen ruling on a motion in arrest of judgment, the trial court is limited to rectifying trial errors, and cannot make a redetermination of the credibility and weight of the evidence." 21 Am.Jur.2d *Criminal Law* § 785 (1998); *see also Taylor*, 348 S.C. at 160, 558 S.E.2d at 921.

Here, Follin maintains the trial court should have granted her motion in arrest of judgment because there was no

evidence to support her charges. Because she is not entitled to an arrest of judgment based on the sufficiency of the evidence, we find no error with the trial court's denial of her motion.

## V. DIRECTED VERDICT

Follin claims the trial court erred in failing to grant her motions for directed verdict and new trial regarding the charges of criminal conspiracy, aiding and abetting the embezzlement, and obtaining goods and services by false pretenses. We disagree.

On appeal from the denial of a directed verdict, an appellate court must view the evidence in the light most favorable to the State. *State v. Lollis,* 343 S.C. 580, 541 S.E.2d 254 (2001); *State v. Burdette,* 335 S.C. 34, 515 S.E.2d 525 (1999); *State v. Kelsey,* 331 S.C. 50, 502 S.E.2d 63 (1998). When ruling on a motion for a directed verdict, the trial court is concerned with the existence of evidence, not its weight. *State v. Spann,* 279 S.C. 399, 308 S.E.2d 518 (1983); *State v. Wakefield,* 323 S.C. 189, 473 S.E.2d 831 (Ct.App.1996). "If there is any direct or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, an appellate court must find the case was properly submitted to the jury." *Lollis,* 343 S.C. at 584, 541 S.E.2d at 256. Conversely, a trial court should grant a motion for a directed verdict when the evidence merely raises a suspicion the accused is guilty. *Id.*

### A. Criminal Conspiracy

Follin alleges there was no evidence to support the charge of criminal conspiracy because there was no evidence that she knowingly entered into an agreement with Klein to defraud District 17 of $1.4 million. We disagree.

Klein testified that the invoices for legitimate District 17 travel were handled differently from the "special" travel invoices that were used to pay for his junket travel. According to Klein, the invoices for the legitimate travel came through the mail, and the clean copies of the illegitimate travel invoices, which were "automatically" voided by Follin, were always hand-delivered. Although the District 17 checks used

to pay Follin for legitimate travel expenses were sometimes mailed and sometimes hand-delivered, the checks issued on the bogus travel invoices, which were credited to Klein's junket travel invoices, were always hand-delivered. He estimated that, from 1989 to 1994, approximately 60% of the money paid by District 17 to Follin covered his junket travel expenses.

Klein declared that Follin helped him by booking luxury travel for his family and friends. Although some of the individuals traveling worked for District 17, Klein stated that some of the individuals were from California, Las Vegas, Philadelphia, and Greenville. Klein usually took luxury trips, eventually paid for by District 17, for New Year's, Mardi Gras, and the Fourth of July. Follin booked a Royal Caribbean cruise for Klein, his girlfriend, and four other individuals, which was paid for by District 17. Trips booked through Follin Travel included a Colorado ski trip for a group of people, a trip to Atlantic City, and a gambling "cruise to nowhere." Follin accompanied the group to the Colorado ski trip and on the gambling "cruise to nowhere." At the direction of Klein, Follin mailed the tickets to the out of town individuals, although Klein testified that on some occasions he told Follin those individuals were reimbursing District 17. Klein professed that he would not have been able to succeed in the travel scheme without Follin.

Klein stated that when he realized District 17 was investigating him in 1997, he contacted Follin and warned her that she was going to be asked about the "special invoices" for trips which were never taken, but were paid for by the district. At Klein's request, Follin created false invoices indicating that the "special invoice" trips were never taken and that District 17 was owed a credit for that payment. She then accepted $52,700 in cashier's checks from Klein to make it appear that District 17 had a credit.

Klein was asked whether there was an explicit agreement between himself and Follin to defraud District 17:

Q: Did you have an agreement with Dale Follin concerning the travel scheme?

A: Say that again, please.

Q: Did you have an agreement with the [sic] Dale Follin concerning the travel scheme?

A: Only through actions.

Q: And what was that agreement?

A: The agreement that our actions did was, I knew that she—

On cross-examination, Klein admitted he told the State Grand Jury that he never sat down with Follin and specifically discussed how to defraud District 17. Klein reiterated, however, that he and Follin had an understanding "only through actions."

SLED Agent Johnny Bartell testified about his interviews with Follin. Initially, Follin maintained District 17 had a large credit and she kept it to apply toward future District 17 travel. Agent Bartell stated Follin first told him that she only kept records for two years, but she later admitted to him that she kept ten years' worth of records. Follin told Agent Bartell that she thought Klein was using the clean copies of the voided invoices to cover up missing money.

After the State presented its case, Follin moved for a directed verdict on the conspiracy charge. She argued there was no evidence of an agreement between herself and Klein to defraud District 17. The trial court denied the motion, and Follin presented her defense.

Dr. Adrena Ray, former District 17 Superintendent, testified regarding her investigation into Klein. During questioning by Follin, Ray described her lack of knowledge that Klein was traveling at the expense of District 17:

Q: Okay. Now, did you have any knowledge that District personnel were going with him on these trips such as Tom Lewis, Sonja Sepulveda, Debbie Elmore, people like that?

A: The only thing I ever heard rumors about—and didn't have any actual proof of—was this Mardi Gras thing. He would be gone in February.

Q: Uh-huh.

A: And as I said, people began to say don't you know where he is, he is in Mardi Gras. Of course he would have told me something else.

Q: Right.

A: But I confronted him about that and he finally said, yes, he did like to go to Mardi Gras and he has a son who was in college and he liked to take the son and his friends.

Q: Did you know he was billing these Mardi Gras trips?

A: No, of course not.

Ray admitted that she had traveled to New Orleans for national conventions twice.

Ray testified regarding the individuals who traveled with Klein to New Orleans:

Q: I'm going to show you an—out of State's exhibit number 4, a document that is a December 27 through January 2nd trip to New Orleans. It's got [sic] 12, 14 people listed on it. Is your name on there?

A: No, I don't see it. It certainly shouldn't be on here.

Q: Mr. Lewis' name is on there, isn't it?

A: Yes.

Q: Mr. Klein?

A: Yes.

Q: Who else?

A: Mark Harris, Ed Thomas, John Martin, ... Tom Lewis, Joe Klein, Sharon Wills, Mary Mueller, Tom Rich, ... Alicia Sissons.

Q: All those folks don't even work for the school district, do they?

A: I never heard of some of them.

. . . .

Q: Here is [the] February 14th through 22nd trip to New Orleans booked through Follin Travel. Read that list of names for the jury. Tell me if your name is on that.

A: Johnny Martin, Mark Clifford, Joseph Klein, Marvin Haley, Mike Hicks, Alexandria Cruickie, Bob—

Q: Is she—has Alexandria Cruickie to your knowledge ever worked in the school district?

A: Never heard of her.

Q: Okay.

A: Linda and Chris Green York.

Q: They ever work in the school district?

A: Never heard of them. Jim and Cindy Monise.

Q: Ever worked in the school district?

A: No, never heard of them. Christopher Mueller, Mark Harris, George and Pat Krane.

Q: Ever worked in the school district?

A: No.

Follin presented two expert witnesses who stated that it was not unusual for an agency to issue a voided invoice, called an "information only" invoice, to a client who wanted to consider taking a trip and needed the pricing information. The two experts testified it was normal for an agency to have only one agent handling corporate accounts and it was not unusual for an agent to hand-deliver tickets.

Follin explained the process of booking travel at trial. Once a travel agency obtains information from a client regarding a trip, the agency issues an invoice and an airline ticket. At the end of the week, the agency must make a report to the Airline Reporting Corporation ("ARC"), and within ten days, the ARC drafts the cost of the trip from the agency's checking account. If the client cancels the trip by the Friday of that same week, the ticket and invoice are voided, ARC never drafts the cost of the ticket from the agency, and the record does not appear in the accounting system. If the client cancels after Friday, the ARC will still draft the cost of the trip from the agency and the agency must later obtain a refund. Follin declared that, before 1996, travel agents made a commission of 10% on airline tickets, but the commission was capped at $50 for a roundtrip ticket and $25 for a one-way ticket after 1997.

Follin professed that she was almost always the travel agent from Follin Travel who handled District 17 travel arrangements with Klein. She set up four accounts related to District 17 travel and Klein: (1) Account number 2099 for District 17's "Leisure/Incentive Travel"; (2) Account number 2022 for general District 17 travel; (3) Account number 214 for District 17 school group travel; and (4) Account number 209 for Klein's personal travel. Follin admitted that all four accounts were

funded by payments from District 17. District 17 accounted for between 8% and 15% of Follin Travel's total business from 1989 to 1997.

Follin believed the Leisure/Incentive travel account covered leisure trips organized by District 17 as incentives. Klein told her the District 17 employees would reimburse the district for the cost of the trip through payroll deductions. Follin stated she believed that the individuals traveling on all of the leisure trips paid for by District 17, including the skiing trip to Colorado and both cruises, were reimbursing the district. Follin went on the skiing trip and the "cruise to nowhere" as an escort, but her expenses were complimentary to her as a travel agent and nothing was billed to District 17, other than the costs of things not complimentary.

Follin denied knowing anything about Klein's scheme to defraud District 17. Although Klein instructed her to deal exclusively with him, it was not unusual to have one contact on a corporate account. Follin said that Klein periodically would request an invoice for a school group's travel and would request her to void it the same week. Because the travel was voided and no longer appeared in her accounting system and the checks would be issued days to weeks later and may include payment for several voided invoices, it was not possible for her to recognize or recall that an amount included in the check from District 17 matched the amount on a particular voided invoice. Further, as the checks did not list the invoice number on them, Follin received instructions from Klein as to which invoice number to apply the funds. Because the checks were signed by Klein and the superintendent, Follin testified that she did not suspect anything was out of the ordinary with the checks. Follin denied on cross-examination ever getting a check from District 17 the day after drafting a voided invoice. However, when shown copies of voided invoices with checks issued in that amount by District 17 the next day, Follin stated she could not recall those incidents.

Follin stated she first suspected Klein might have been involved in wrong-doing in September 1997 when she requested a deposit for a cruise he had booked and he immediately asked her for a voided invoice in the same amount for a school

group. Follin testified that she created the invoice, but no longer handled travel arrangements with Klein after that time.

Follin described the events leading to the creation of the "credit." According to Follin, Klein called her on a Sunday sometime in early October and requested that she meet him at her office. Klein asked her to create false statements, backdated to June 30, 1997, which indicated that District 17 had a large credit due to purchased trips that were canceled. Reviewing Follin's copies of District 17's voided invoices, Klein deduced which of the 1997 trips would be audited and he told Follin she would be asked about them. Klein instructed Follin to tell District 17 officials that he directed her to maintain the credit instead of issuing a refund check. Follin declared that Klein commented about her grandson, whom she had custody of, during the meeting. Because he had never done that before, Follin said she felt Klein was threatening her life and her grandson's life if she did not create the false credit statements as he asked. However, Follin refused to shred the documents concerning District 17 travel as Klein requested. Follin kept the cashier's checks Klein and Adams brought later that week in her safe deposit box at her bank.

Follin testified regarding her conversations with Principal Raffield and District 17 Attorney Davis during their investigation of District 17 travel. Follin admitted telling them that District 17 had a credit and showing them the false statements. She stated that, when asked for the refund, she told them the money was at an out-of-town bank. Follin later wrote a check for $70,389.10 to District 17. Although Follin initially pretended District 17 was owed a "refund," she eventually admitted to SLED that Klein had given her the money and turned over all her documents. However, Follin denied conspiring with Klein to defraud District 17 and denied receiving anything from the transactions other than her normal commission.

Criminal conspiracy is "a combination between two or more persons for the purpose of accomplishing an unlawful object or lawful object by unlawful means." S.C.Code Ann. § 16–17–410 (Supp.2001). To constitute conspiracy, there must be an agreement or a mutual understanding. *State v. Horne,* 324 S.C. 372, 478 S.E.2d 289 (Ct.App.

1996). Proof of an express agreement or direct evidence of the agreement is not essential, but the conspiracy may be shown by circumstantial evidence and the actions of the parties. *State v. Kelsey,* 331 S.C. 50, 502 S.E.2d 63 (1998). "The substantive crimes committed in furtherance of the conspiracy constitute circumstantial evidence of the existence of the conspiracy, its object, and scope." *State v. Gosnell,* 341 S.C. 627, 636, 535 S.E.2d 453, 458 (Ct.App.2000).

Viewing the evidence in the light most favorable to the State, Klein would not have been able to proceed with his travel scheme without Follin's assistance. Despite the fact that there was not a spoken agreement between the two to defraud District 17, the uncontradicted evidence showed that Follin knowingly assisted Klein by creating false records indicating District 17 had a credit. Klein testified that he and Follin conspired through their actions. Although the agreement was not written or verbalized, evidence was presented that an arrangement was reached between Klein and Follin to defraud District 17. Because there was evidence that reasonably tended to prove Follin conspired with Klein, the trial judge properly denied Follin's motion for a directed verdict as to this charge.

## B. Aiding and Abetting

Follin contends the trial court should have granted her motion for a directed verdict as to the charge of aiding and abetting embezzlement because there was no evidence that she had the intent to defraud District 17. She asserts the evidence shows at most that she was an accessory after the fact. We disagree.

Follin was indicted for aiding and abetting embezzlement in violation of S.C.Code Ann. § 16–13–210 (Supp.2001). Section 16–13–210 provides that it is "unlawful for an officer or other person charged with the safekeeping, transfer, and disbursement of public funds to embezzle these funds."

At the close of the State's case, Follin moved for a directed verdict on the embezzlement charge. The trial judge denied her motion. At the close of all the evidence, Follin renewed her motion. The trial court found that Follin's act of knowingly creating false invoices at Klein's request to help him avoid

detection was evidence of aiding and abetting the embezzlement. The trial court denied Follin's directed verdict motion.

When the factual presentation is viewed in the light most favorable to the State, the evidence was sufficient to go to the jury. Follin knowingly assisted Klein in hiding his fraud. Klein testified Follin implicitly agreed to assist him by submitting false invoices and then crediting the amounts paid on the invoices to his personal travel. Because there was sufficient evidence to submit the matter to the jury, the trial court did not err in denying Follin's directed verdict motion.

### C. Obtaining Goods and Services by False Pretenses

██ Follin argues the trial court erred by denying her motion for a directed verdict on the charge of obtaining goods and services by false pretenses. We disagree.

After the State presented its case, Follin moved for a directed verdict on the charge of obtaining property by false pretenses, which was denied by the trial court. At the close of all the evidence, Follin renewed her motion, which was denied.

Section 16–13–240 provides that it is a felony for a person to, "by false pretense or representation[,] obtain[] the signature of a person to a written instrument or obtain[] from another person any chattel, money, valuable security, or other property, real or personal, with intent to cheat and defraud a person of that property." S.C.Code Ann. § 16–13–240 (Supp. 2001).

Although Follin claims no evidence was presented which showed she made any false representations to District 17 in order to obtain money, the evidence, when viewed in a light most favorable to the State, lends a different conclusion. Follin provided voided invoices to Klein and accepted payment for them from District 17. This was evidence of a false representation. Accordingly, we find there was sufficient evidence to deny the motion for a directed verdict and to submit the matter to the jury.

### *CONCLUSION*

Based on the foregoing, Follin's convictions and sentences are

**AFFIRMED.**

STILWELL, J., concurs in a separate opinion.

CONNOR, J., dissents in a separate opinion.

STILWELL, J. (Concurring):

I concur in Judge Anderson's opinion, but write separately to focus on what I consider to be an extremely difficult task faced by an appellate court in passing upon the acceptability of the sentence imposed in this case.

It is an undeniable fact that for generations trial courts have not only been allowed but actually encouraged to consider the entry of a guilty plea as an ameliorating factor in structuring an appropriate sentence. In stark contrast, it is now and has been for many years totally unacceptable to impose a harsher sentence because a defendant demands a jury trial rather than entering a guilty plea. These two concepts are almost irreconcilable.

Here, the sentencing judge made statements that clearly indicated his

motivation for imposing a somewhat harsher sentence upon this defendant than upon other defendants who entered guilty pleas was based upon acceptable considerations. At the same time, the sentencing judge made remarks that can be and have been interpreted as being violative of recent decisions of this court and the supreme court.

The question, then, is which of the two diametrically opposite statements are we to consider as controlling in judging his motivation? Are we to look exclusively at those statements that are unacceptable, disregarding the acceptable, or do we do just the opposite and disregard the unacceptable in favor of the acceptable?

Under the circumstances of this case, perhaps the best thing if not the only thing to do is to disregard the statements altogether or consider them neutral on the issue of his motivation, and determine whether, on the record, the sentence imposed is justified in comparison to the more lenient sentence imposed on other defendants. Using that as the criteria, this sentence is unquestionably justified.

CONNOR, J. (dissenting):

I respectfully dissent from Issue II in the majority opinion and would reverse Follin's sentence and remand for resentencing. The trial judge committed an error of law by improperly considering Follin's decision to proceed with a jury trial. As noted by the majority, the trial judge made it quite clear by his statements that he was giving Follin a harsher sentence because she had not pled guilty, as most of her co-defendants had.

He specifically stated he gave consideration to the defendants who entered guilty pleas and admitted their guilt.[6][1] The judge further asserted he could not ignore another defendant's admission of guilt.[7][2] Such sentencing comments have been expressly disapproved and warrant reversal. *See Davis v. State,* 336 S.C. 329, 520 S.E.2d 801 (1999) (disapproving the trial judge's statements regarding other defendants' guilty pleas and admissions of guilt); *State v. Brouwer,* 346 S.C. 375, 387, 550 S.E.2d 915, 922 (Ct.App.2001) (disapproving the trial judge's "serious consideration for someone admitting their guilt" as being "the first step towards rehabilitation").

Furthermore, I disagree with the majority's interpretation of *Brouwer.* Specifically, the majority's conclusion that "when the record clearly reflects an appropriate basis for a disparate sentence, the sentencing judge may impose a different sentence on a co-defendant in a criminal trial" is troubling. In my opinion, a sentencing review pursuant to *Brouwer* requires us to confine our analysis to the judge's comments on the record at sentencing. I do not believe the language of *Brouwer* permits a de novo review of whether there is an "appropriate basis" for a sentence, especially where, as here, to do so would negate a judge's comments which are clearly based on

**6.** [1] For example, in Johnny Martin's case, the trial judge stated "[t]he other people got consideration for their sentence because they entered a guilty plea.... I gave credit for admitting guilt." The trial judge specifically incorporated these statements during Follin's sentence reduction hearing.

**7.** [2] The trial judge stated, "as I mentioned in sentencing Johnny Martin and I have said throughout and will continue to say I can't ignore [co-defendant] Benji Adams admitting his guilt...."

an improper consideration of a defendant's decision to exercise her right to a jury trial.