608 S.E.2d 886

The STATE, Respondent,

v.

Bernard CRAWFORD, Appellant.

No. 3933.

Court of Appeals of South Carolina.

Heard Jan. 11, 2005.
Decided Jan. 31, 2005.

628

630

Assistant Appellate Defender Aileen P. Clare, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Attorney General Harold M. Coombs, Jr., all of Columbia; and Solicitor Thomas E. Pope, of York, for Respondent.

ANDERSON, J.:

Bernard Crawford (Appellant) was convicted of criminal conspiracy and sentenced to five years in prison. He appeals, arguing the trial judge erred in denying his motion for a directed verdict. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

On the night of August 20, 2002, John Crawford (John) awoke his son, Jonathan Crawford (Jonathan), and demanded Jonathan take him to get something to eat. John is Appellant's brother, and Jonathan is John's son, Appellant's nephew. Jonathan testified at Appellant's trial that his father was drunk and irate. Jonathan acquiesced, and on their way to a fast-food restaurant, John and Jonathan picked up Appellant, who had been walking along the side of the road. According to Jonathan's testimony, the three of them proceeded to a fast-food restaurant. John then directed Jonathan to drive to an apartment complex, but suddenly demanded that Jonathan stop the vehicle so he could urinate behind a building. Jonathan stopped the car at Sunbelt Rentals. Shortly after John exited the vehicle, Jonathan heard glass break from the direction of Sunbelt Rentals.

In his statement to police, Jonathan averred Appellant exited the vehicle upon hearing the glass break. He saw John

and Appellant carrying stolen saws from the store to the car. According to his sworn statement, John and Appellant loaded the saws into the car and demanded Jonathan drive away.

Officer Jenkins witnessed the vehicle, with its headlights off, pulling out of the parking lot of Sunbelt Rentals. The officer, who had been traveling in the opposite direction of the Crawfords, turned around to follow Jonathan's vehicle. Jonathan sped up, and the officer activated his blue lights. Officer Jenkins testified that it appeared as though objects were being thrown out of the sunroof. In his statement, Jonathan claimed that upon seeing the police car, Appellant handed John the saws from the backseat, and John threw the saws out of the vehicle's passenger side window. Appellant ran from police once the vehicle was stopped. Bolt cutters, gloves, and newly purchased flashlights were found in the vehicle.

The police charged Jonathan, John, and Appellant with conspiracy, burglary, and grand larceny. All charges against Jonathan subsequently were dropped. John pled guilty to all the charges and was sentenced to a total of fifteen years in prison. At Appellant's trial, John claimed full responsibility for the crimes: "[n]either one of them . . . had really anything to do with it. . . . [I]f he would have helped me or somebody would have helped me, I wouldn't have gotten caught." According to John, neither Jonathan nor Appellant knew his intention to break into Sunbelt Rentals.

Jonathan's trial testimony differs substantially from the statement he gave to police. In court, Jonathan proclaimed: ". . . I don't know if Bernard Crawford got out of the car between the time that he ran in the building and came back." He stated further: "I had tunnel vision. I didn't look around and look back. I didn't see anything 'til my father put the saws in the back seat and jumped in the front seat and said, 'Let's go.'" Jonathan testified that John slapped him and may have slapped at Appellant as well. John yelled at them both demanding they obey his orders. Jonathan remembered Appellant telling John: "you basically just got us in trouble, you know, for your stupidity."

When the State rested its case, Appellant moved for a directed verdict as to all charges. The trial court denied the motion, concluding that substantial evidence was extant in the

record from which the jury could infer that the State had proven the elements of each of the offenses, focusing particularly on Jonathan's previous statement to police about Appellant's involvement. The jury found Appellant guilty of criminal conspiracy and acquitted him of the remaining charges. The trial court sentenced Appellant to five years in prison.

## STANDARD OF REVIEW

On appeal from the denial of a directed verdict in a criminal case, an appellate court must view the evidence in the light most favorable to the State. *State v. Curtis,* 356 S.C. 622, 591 S.E.2d 600 (2004); *State v. Al–Amin,* 353 S.C. 405, 578 S.E.2d 32 (Ct.App.2003); *State v. Morgan,* 352 S.C. 359, 574 S.E.2d 203 (Ct.App.2002). When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight. *State v. Cherry,* 361 S.C. 588, 606 S.E.2d 475 (2004); *State v. Wilds,* 355 S.C. 269, 584 S.E.2d 138 (Ct.App.2003); *State v. McLauren,* 349 S.C. 488, 563 S.E.2d 346 (Ct.App.2002). If there is any direct evidence or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, this Court must find the case was properly submitted to the jury. *State v. Rosemond,* 356 S.C. 426, 589 S.E.2d 757 (2003); *State v. Lindsey,* 355 S.C. 15, 583 S.E.2d 740 (2003); *see also State v. Ballington,* 346 S.C. 262, 551 S.E.2d 280 (Ct.App.2001) (stating judge should deny motion for directed verdict if there is any direct or substantial circumstantial evidence which reasonably tends to prove accused's guilt, or from which his guilt may be fairly and logically deduced). On the other hand, a defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged. *State v. McKnight,* 352 S.C. 635, 576 S.E.2d 168 (2003); *State v. McCluney,* 357 S.C. 560, 593 S.E.2d 509 (Ct.App.2004); *State v. Padgett,* 354 S.C. 268, 580 S.E.2d 159 (Ct.App.2003). The appellate court may reverse the trial judge's denial of a motion for a directed verdict only if there is no evidence to support the judge's ruling. *State v. Gaster,* 349 S.C. 545, 555, 564 S.E.2d 87, 92 (2002).

## LAW/ANALYSIS

Appellant claims the trial court erred in denying his motion for a directed verdict because the State failed to introduce

substantial evidence he was guilty of conspiracy. We disagree.

## I. Prior Inconsistent Statement as Substantive Evidence

■ *State v. Copeland,* 278 S.C. 572, 300 S.E.2d 63 (1982), established that testimony of prior inconsistent statements may be used as "substantive evidence when the declarant testifies at trial and is subject to cross examination." *Id.* at 581, 300 S.E.2d at 69; *accord State v. Smith,* 309 S.C. 442, 424 S.E.2d 496 (1992); *State v. Ferguson,* 300 S.C. 408, 388 S.E.2d 642 (1990); *State v. Caulder,* 287 S.C. 507, 339 S.E.2d 876 (Ct.App.1986). In this case, Jonathan gave a statement to police following his arrest asserting that Appellant participated in the grand larceny and burglary. However, at trial Jonathan testified that he was unsure whether Appellant exited the vehicle, and that Appellant objected to John's actions once John was back in the car. The contradiction between Jonathan's sworn statement to police and his later testimony in court is a matter of weight for the jury to decide. *Copeland* at 582, 300 S.E.2d at 69. The later testimony does not obviate the efficacy of the first statement made closer in time to the event in question. *Id.*

## II. Flight Evidence

■ Once Jonathan stopped the car, Officer Jenkins instructed John, Jonathan, and Appellant to remain in the vehicle until backup arrived. With another officer present, Officer Jenkins had each individual step out of the car, one at a time. He provided the following description of the arrests:

A. The last person I pulled out was Bernard, which was the subject seated in the passenger side rear. I had him exit and also patted him down for weapons.

Q. All right. And at that point what happened?

A. As soon as I began patting Bernard down for weapons, he jerked away from me and took off running down Ebenezer.

After a short chase, Officer Jenkins returned to John and Jonathan to place them under arrest. Additional law enforcement personnel soon arrived and Officer Jenkins resumed the search for Appellant. He explained:

A.... [W]e got a call of a subject around some apartments on Ebenezer Avenue ...

. . . .

At that time, I did proceed to that area and I did locate Bernard Crawford hiding in the bushes in the front. It was myself and an officer from Winthrop.

Q. All right. And at that time were you able to apprehend him?

A. No, I was not. I ordered him out from the bushes. At that time I was at the rear of the bushes. He exited out through the front of the bushes, ran and jumped over another fence and continued on.

Eventually, Appellant was apprehended.

■■■ "Flight from prosecution is admissible as evidence of guilt." *State v. Al-Amin*, 353 S.C. 405, 413, 578 S.E.2d 32, 36–37 (Ct.App.2003); *see also State v. Ballenger*, 322 S.C. 196, 200, 470 S.E.2d 851, 854 (1996) (stating flight is "at least some evidence" of defendant's guilt); *State v. Freely*, 105 S.C. 243, 89 S.E. 643 (1916) (declaring the flight of one charged with crime has always been held to be some evidence tending to prove guilt). Evidence of flight has been held to constitute evidence of defendant's guilty knowledge and intent. *See State v. Beckham*, 334 S.C. 302, 513 S.E.2d 606 (1999); *Town of Hartsville v. Munger*, 93 S.C. 527, 77 S.E. 219 (1913); *State v. Brownlee*, 318 S.C. 34, 455 S.E.2d 704 (Ct.App.1995); *see also State v. Thompson*, 278 S.C. 1, 292 S.E.2d 581 (1982), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991) (finding evidence of flight admissible to show guilty knowledge, intent, and that defendant sought to avoid apprehension); *State v. Grant*, 275 S.C. 404, 407, 272 S.E.2d 169, 171 (1980) ("[A]ttempts to run away have always been regarded as some evidence of guilty knowledge and intent.") (internal quotation marks omitted); *State v. Davis*, 354 S.C. 348, 580 S.E.2d 778 (Ct.App.2003) (noting that circumstances of defendant's flight from police after they attempted traffic stop allowed reasonable inference of guilty conduct). Flight, when unexplained, is admissible as indicating consciousness of guilt, for it is not to be supposed that one who is innocent and conscious of that fact would flee. *See*

*State v. Williams,* 350 S.C. 172, 564 S.E.2d 688 (Ct.App.2002) (citing 29 Am.Jur.2d *Evidence* § 532 (1994)).

The critical factor to the admissibility of evidence of flight is whether the totality of the evidence creates an inference that the defendant had knowledge that he was being sought by the authorities. *Beckham,* 334 S.C. at 315, 513 S.E.2d at 612. It is sufficient that circumstances justify an inference that the accused's actions were motivated as a result of his belief that police officers were aware of his wrongdoing and were seeking him for that purpose. *Id.* (citing *Commonwealth v. Jones,* 457 Pa. 563, 319 A.2d 142 (1974)). Flight or evasion of arrest is a circumstance to go to the jury. *See Beckham,* 334 S.C. at 315, 513 S.E.2d at 612; *State v. Turnage,* 107 S.C. 478, 93 S.E. 182 (1917); *see also State v. Byers,* 277 S.C. 176, 284 S.E.2d 360 (1981) (recognizing that evidence of flight is proper and that it is oftentimes appropriate for counsel to argue to the jury the inferences growing out of flight); *Grant,* 275 S.C. at 408, 272 S.E.2d at 171 (stating that while a jury charge on flight as evidence of guilt is improper, admission of evidence and argument by counsel concerning it are allowed).

Testimony established that Appellant fled the scene when police attempted to arrest him. In South Carolina, Appellant's flight constitutes evidence of his guilt.

### III. Criminal Conspiracy

Criminal conspiracy is statutorily defined as "a combination between two or more persons for the purpose of accomplishing an unlawful object or a lawful object by unlawful means." S.C.Code Ann. § 16–17–410 (2003); *accord State v. Gordon,* 356 S.C. 143, 588 S.E.2d 105 (2003); *State v. Follin,* 352 S.C. 235, 573 S.E.2d 812 (Ct.App.2002) *cert. denied, State v. Horne,* 324 S.C. 372, 478 S.E.2d 289 (Ct.App.1996); *cf. LaMotte v. Punch Line of Columbia,* 296 S.C. 66, 370 S.E.2d 711 (1988) (comparing civil conspiracy, which is a combination of two or more persons joining for the purpose of injuring plaintiff and causing special damage to plaintiff, with criminal conspiracy).

This statutory pronouncement is declaratory of the common law definition of conspiracy. *See State v. Fleming,* 243 S.C. 265, 133 S.E.2d 800 (1963) (observing the predecessor to § 16–

17–410 was declaratory of the common law definition). The crime of conspiracy has long been recognized in this state. *See, e.g., State v. De Witt,* 20 S.C.L. (2 Hill) 282 (1834) (affirming conspiracy as a viable common law offense and discussing the breadth of its applicability).

Historically, conspiracy was a misdemeanor. *See State v. Ferguson,* 221 S.C. 300, 306, 70 S.E.2d 355, 358 (1952) ("Conspiracy is a common-law offense and is a misdemeanor."). Currently, conspiracy is a felony and carries a maximum sentence of $5,000 or five years imprisonment. S.C.Code Ann. § 16–17–410 (2003). "A person who is convicted of the crime of conspiracy must not be given a greater fine or sentence than he would receive if he carried out the unlawful act contemplated by the conspiracy and had been convicted of the unlawful act contemplated by the conspiracy. . . ." *Id.*

 The gravamen of the offense of conspiracy is the agreement, or combination. *State v. Dasher,* 278 S.C. 454, 298 S.E.2d 215 (1982); *see also State v. Buckmon,* 347 S.C. 316, 323, 555 S.E.2d 402, 405 (2001) ("The essence of a conspiracy is the agreement."). "In criminal conspiracy it is not necessary to prove an overt act. The gist of the crime is the unlawful combination. The crime is then complete, even though nothing further is done." *Ferguson* at 303, 70 S.E.2d at 356 (citing *State v. Ameker,* 73 S.C. 330, 53 S.E. 484 (1906)).

 A formal or express agreement need not be established. *Horne* at 381, 478 S.E.2d at 293. "A tacit, mutual understanding, resulting in the willful and intentional adoption of a common design by two or more persons is sufficient, provided the common purpose is to do an unlawful act either as a means or an end." *Id.* (citation omitted). Professor McAninch explains: "The mere fact that two persons happened to be doing the same thing at the same time does not compel the conclusion that there was a conspiracy." William Shepard McAninch & W. Gaston Fairey, *The Criminal Law of South Carolina,* 476 (4th ed.2002). In *State v. Ameker,* 73 S.C. 330, 53 S.E. 484 (1906), our supreme court placed its approbation on the following explanation of conspiracy given by the trial judge:

"[S]uppose, Mr. Foreman, that you and the gentleman on your left would go out in the streets of Orangeburg and

commit an assault and battery on some other person, that would be an unlawful act, but it would not be a conspiracy, unless there was an agreement between you to do the act before doing it. It is an *agreement* to do an unlawful act that is the gist of the whole matter."

*Id.* at 339, 53 S.E. at 487.

In *State v. Mouzon,* 321 S.C. 27, 467 S.E.2d 122 (Ct.App. 1995), the defendant appealed his conviction for conspiracy to distribute crack cocaine. One witness testified that on the night in question, several individuals, including the defendant, were present where drug transactions were taking place. *Id.* at 32, 467 S.E.2d at 125. We reversed the conviction, holding:

[T]o prove conspiracy, it is not enough that a group of people separately intend to distribute drugs in a single area, nor enough that their activities occasionally or sporadically place them in contact with each other. What is needed is proof they intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged.

*Id.* at 32–33, 467 S.E.2d at 125 (internal quotation marks and citation omitted); *see also State v. Gunn,* 313 S.C. 124, 437 S.E.2d 75 (1993) (holding it is not enough for the offense of conspiracy that a group of people separately intend to distribute drugs in a single area, nor that their activities occasionally or sporadically place them in contact with each other).

 Because it takes at least two persons to enter into an agreement, there must be at least two members of a conspiracy. *See State v. Jackson,* 7 S.C. (7 Rich.) 283 (1876). "Yet they need not all be indicted or named. Indeed, an indictment charging that the named defendant and 'other persons unknown ... did ... conspire' was approved in *State v. Hightower,* 221 S.C. 91, 94, 69 S.E.2d 363, 366 (1952)[.]" McAninch & Fairey 481. In *Hightower,* there was "ample evidence that the conspirators, though unknown, did exist." McAninch & Fairey 481.

 A conspiracy to commit a crime does not merge with the completed offense. *State v. Rutledge,* 232 S.C. 223, 101 S.E.2d 289 (1957); *see also Ferguson* at 303–04, 70 S.E.2d at 356–57 (observing that a conspiracy does not merge with a completed crime, "but is a distinct offense in itself and punish-

able as such, notwithstanding that the object of the conspiracy has been accomplished").

*State v. Wells,* 249 S.C. 249, 153 S.E.2d 904 (1967) recognized the existence of Wharton's Rule in South Carolina, but denied its application under the facts of *Wells.* Wharton's Rule states that where

co-operation or concert between two or more persons is essential to the commission of a substantive crime and there is no ingredient of an alleged conspiracy that is not present in the substantive crime, it is held that the persons necessarily involved cannot be charged with conspiracy to commit the substantive offense and also with the substantive crime itself.

*Id.* at 256, 153 S.E.2d at 907–08; *see also Ferguson* at 303, 70 S.E.2d at 356 ("It is true that in some cases where concerted action is necessary, as for example in certain sexual offenses, it is not permitted to charge one in the same indictment with a conspiracy and also with the substantive crime."). Thus,

if the substantive offense requires by definition the concerted action of two persons, as for example the crime of adultery, then those persons cannot be convicted of conspiracy to commit the offense because this would merely be a subterfuge to increase the legislatively authorized punishment for the substantive offense.

McAninch & Fairey 482.

Once an agreement has been reached, the crime of conspiracy has been committed; no further act need take place. "Conspiracy is an inchoate offense, and is a crime in and of itself." 15A C.J.S. *Conspiracy* § 98 (2002) (footnotes omitted); *see Black's Law Dictionary* 1108 (7th ed.1999) (defining "inchoate offense" as "[a] step toward the commission of another crime, the step in itself being serious enough to merit punishment."). "Prohibition of conspiracy serves two distinct purposes: the punishment of group behavior and the control of inchoate activities." 15A C.J.S. *Conspiracy* § 98.

The basis of conspiratorial liability is not to punish the agreement per se, but, rather, like other inchoate crimes, to punish the firm purpose to commit a substantive crime, while hopefully preventing the actual commission thereof.

*Id.; see also* McAninch & Fairey 474 ("The basic rationale of conspiracy seems to be that the combination of two or more persons makes it more likely that the criminal objective will be achieved, because the co-conspirators may offer each other encouragement and support, thereby rendering it less likely that the project will be abandoned.").

 "It need not be shown that either the object or the means agreed upon is an indictable offense in order to establish a criminal conspiracy. It is sufficient if the one or the other is unlawful." *Fleming* at 274, 133 S.E.2d at 805. *Ameker* demonstrates the breadth of activity that can give rise to an indictment for conspiracy. 73 S.C. 330, 53 S.E. 484 (1906). In *Ameker*, the defendant was convicted of "unlawfully, feloniously, and willfully conspir[ing] ... for the purpose of hindering, preventing, and obstructing certain citizens ... [who were] engaging in social intercourse and peaceable pastimes, such as are commonly enjoyed at picnics ..." *Id.* at 332–33, 53 S.E. at 484–85. The action arose when a group of picnickers was disturbed by the defendant and several co-conspirators. "Abe Ameker began playing his banjo, while Cleveland Hooker danced and cursed.... One of the defendants had a paddle in his hand, and the inevitable pistol was also in hand." *Id.* at 337, 53 S.E. at 486. One man was struck with the boat paddle, and knives and guns were drawn before the engagement subsided. *Id.* The court upheld Ameker's conviction.

 Our supreme court, in *State v. Amerson,* noted that "a single conspiracy may be established by completely different aggregations of proof so that there appears to be several conspiracies." 311 S.C. at 319, 428 S.E.2d at 873 (1993) (citation omitted). Consequently, "a multi-pronged flexible 'totality of the circumstances' test is applied to determine whether there were two conspiracies or merely one." *Id.* The test considers:

> (1) the time periods covered by the alleged conspiracies; (2) the places where the conspiracies are alleged to have occurred; (3) the persons charged as conspirators; (4) the overt acts alleged to have been committed in furtherance of the conspiracies, or any other descriptions of offenses charged which indicate the nature and scope of the activities

being prosecuted; and (5) the substantive statutes alleged to have been violated.

*Id.*

■ Once a conspiracy has been established, evidence establishing beyond a reasonable doubt the connection of a defendant to the conspiracy, even though the connection is slight, is sufficient to convict him with knowing participation in the conspiracy. *Horne,* 324 S.C. at 382, 478 S.E.2d at 294 (citing *State v. Sullivan,* 277 S.C. 35, 282 S.E.2d 838 (1981)).

■ Generally, the conspiracy is proven by overt acts committed in furtherance of the conspiracy. *Amerson,* 311 S.C. at 319–20, 428 S.E.2d at 873. However, overt acts are not necessary for a conspiracy conviction. "It is axiomatic that a conspiracy may be proved by direct or circumstantial evidence or by circumstantial evidence alone." *Horne,* 324 S.C. at 381, 478 S.E.2d at 294 (citing *State v. Childs,* 299 S.C. 471, 385 S.E.2d 839 (1989)). Indeed, *State v. Miller,* 223 S.C. 128, 74 S.E.2d 582 (1953), notes: "Often proof of conspiracy is necessarily by circumstantial evidence alone." *Id.* at 133, 74 S.E.2d at 585 (citation omitted). Because the actus reus of conspiracy is the agreement, the evidence must prove the agreement, not the object thereof. McAninch observes, "The agreement might be difficult to establish by direct evidence if none of the co-conspirators will talk. Consequently, the cases in this jurisdiction, as well as others, which hold that the agreement can be established by circumstantial evidence are legion." McAninch & Fairey 476 (citations omitted). The State "is permitted great latitude in the introduction of circumstantial evidence to establish the existence of a conspiratorial agreement." *State v. Wilson,* 315 S.C. 289, 294, 433 S.E.2d 864, 868 (1993).

*State v. Oliver,* 275 S.C. 79, 267 S.E.2d 529 (1980), exemplifies the sufficiency of circumstantial evidence to convict on conspiracy. Oliver was indicted along with two other individuals for conspiracy to commit housebreaking and grand larceny. *Id.* at 79, 267 S.E.2d at 530. The defendants were accused and convicted of breaking into two houses. Upon conviction, Oliver appealed, asserting the evidence was insufficient and his motion for a directed verdict should have been granted. *Id.* at 79–80, 267 S.E.2d at 530. Evidence showed Oliver's

codefendant, Willie Williams, rented a U–Haul truck a few weeks before the crimes. On the day of the break-ins, Williams purchased gasoline in the U–Haul truck approximately forty or fifty miles from the crime scene, and a receipt for the gas purchase was found near one of the houses. A neighbor of one of the homes observed the U–Haul parked in the neighborhood. A filling station attendant and the neighbor both testified to seeing three men wearing dark clothes in the truck. Similar shoe tracks were found at both houses, "indicating that the same individuals entered both places." *Id.* at 81, 267 S.E.2d at 531. Finally, a law enforcement officer arrested the defendants approximately three miles from the scene of one of the homes. The defendants were in the U–Haul truck and matched the descriptions given by the station attendant and neighbor. The court found this evidence "reasonably tended to establish the guilt of appellants, and the trial judge properly denied their motions for a directed verdict." *Id.* at 82, 267 S.E.2d at 531. The court stated:

Although there is no direct evidence that appellants and their codefendant had a mutual understanding to commit housebreaking and larceny, the facts and circumstances are susceptible to the reasonable inference that they did in fact conspire to commit the unlawful acts.

*Id.* at 80, 267 S.E.2d at 530.

*State v. Kelsey,* 331 S.C. 50, 502 S.E.2d 63 (1998), involved the sufficiency of evidence for a criminal conspiracy conviction. The appellant, Kelsey, and several other individuals spent the day of July 11, 1994, building pipe bombs. That night, they picked up the victim and took her to a party. Several hours later the defendants offered to take the victim home. The court described the events leading to the victim's death:

Defendants and [victim] then got into Lee's car, ostensibly to take [victim] home. Lee was driving, Kelsey was in the passenger seat, and Payne and [the victim] were in the backseat. Although [the victim] had given them directions to her house, Lee detoured in the opposite direction.... Lee turned around and saw that Payne had [victim] in a "strangle hold type position." Lee continued to drive. A few minutes later, Lee "heard two quick, empty thud type sounds." ... Kelsey testified that he had also turned

around and saw that [victim's] body was limp, her face was pale, and her lips were blue.

Lee once again drove away from the bridge. He got approximately 100 feet down the road when Payne told him to stop the car. Defendants pulled [victim] out of the car and carried her into the woods and up an embankment where they placed her on the ground. Lee returned to the car. Payne and Kelsey remained by [victim]'s body.

Kelsey testified that while he was standing over [victim]'s body, Payne instructed him to place a pipe bomb into [victim]'s mouth. Kelsey complied. Payne then lit the fuse, and the two ran. A few seconds later, the bomb exploded. Defendants returned to Kirchner's house where they fell asleep.

*Id.* at 59–61, 502 S.E.2d at 67–68.

The court upheld the conspiracy conviction under the following analysis:

In *State v. Childs,* 299 S.C. 471, 385 S.E.2d 839 (1989), the defendant argued that the trial court erred in denying his motion for a directed verdict on a conspiracy charge. We disagreed, finding that the following facts tended to prove the defendant's guilt: evidence that defendant knew codefendant; defendant was seen running from the area where the victim's body was found; bloodhounds had tracked the victim's scent to the codefendant's house; and defendant had given a written statement stating that he agreed to be a lookout for codefendant.

In this case, evidence indicated that Kelsey was instrumental in constructing the pipe bombs at Kirchner's house; that Kelsey was with Lee and Payne on the night of the murder; that Kelsey helped Payne carry [victim] into the woods; that Kelsey and Payne were alone together in the woods with [victim]'s body; and that Kelsey placed the pipe bomb into [victim]'s mouth. We therefore find the evidence was sufficient to submit the conspiracy charge to the jury.

*Id.* at 63–64, 502 S.E.2d at 70.

In *State v. Follin,* 352 S.C. 235, 573 S.E.2d 812 (Ct.App. 2002), *cert. denied,* Follin was convicted of aiding and abetting embezzlement, obtaining goods and services by false pretenses, and conspiracy. One of her issues on appeal was that

her motion for a directed verdict should have been granted on the conspiracy charge. The facts underlying *Follin* involved "the diversion of nearly $2.5 million from Sumter County School District 17 (District 17) by Adolph Joseph Klein, the Assistant Superintendent in charge of Financial Affairs for District 17." *Id.* at 240, 573 S.E.2d at 814. Follin was a travel agent and owner of Follin Travel who handled the travel arrangements for District 17. From 1987 to 1997, Klein diverted nearly $1.5 million in personal travel expenses for himself and his friends and family by booking luxury vacations through Follin, which were paid for by District 17. The *Follin* court explained,

> In 1995, Klein learned that if travel plans made one week were cancelled before the Friday of that same week, no payment would be required on the trip, the invoice would be voided, and the invoice number would no longer appear in Follin's computerized accounting system. He began using invoices to get District 17 to pay for his junket travel. Klein would request an invoice from Follin for what appeared to be legitimate travel for a school group or a District 17 employee. Klein would then request that Follin void the invoice prior to the Friday of that week. Follin would cancel the trip in her computer and stamp "void" on her copy of the invoice. However, Klein submitted his clean copy of the invoice to District 17 for payment. Klein called these invoices "special invoices" for the junket travel. After the check was issued to Follin on the special invoice, Klein would attach a note to the check identifying for Follin the invoice number to which she should apply the check. The invoice number did not match the number on the special invoice submitted to District 17 for payment but matched the invoice number of another of Klein's junket trips.

*Id.* at 240–41, 573 S.E.2d at 814–15. When District officials began investigating Klein's travel expenses, Follin attempted to cover up the scheme by asserting the District had a refund credit.

We found sufficient evidence to support the denial of a directed verdict on criminal conspiracy:

> Viewing the evidence in the light most favorable to the State, Klein would not have been able to proceed with his travel scheme without Follin's assistance. Despite the fact

that there was not a spoken agreement between the two to defraud District 17, the uncontradicted evidence showed that Follin knowingly assisted Klein by creating false records indicating District 17 had a credit. Klein testified that he and Follin conspired through their actions. Although the agreement was not written or verbalized, evidence was presented that an arrangement was reached between Klein and Follin to defraud District 17. Because there was evidence that reasonably tended to prove Follin conspired with Klein, the trial judge properly denied Follin's motion for a directed verdict as to this charge.

*Id.* at 267, 573 S.E.2d at 829–30. *See also State v. Clark,* 286 S.C. 432, 334 S.E.2d 121 (1985) (finding "ample evidence ... to support appellant's conviction of conspiracy" to housebreak where appellant was found near the crime scene; was apprehended as he drove away with his headlights off; originally denied knowing his codefendant, who was later determined to be his cousin; and admitted his codefendant told him of the larceny plans, but denied any participation in them).

█ In the instant case, sufficient evidence exists to support the trial judge's denial of Appellant's motion for a directed verdict. Appellant was in the vehicle immediately after the burglary was perpetrated, and he fled when Jonathan stopped the car. Jonathan's statement contradicts his trial testimony, and it was the responsibility of the jury to weigh both his statement and his testimony. According to his statement, Jonathan witnessed Appellant (1) carrying stolen saws from the store to the car; (2) loading saws into the car; and (3) handing John the saws from the backseat. Furthermore, the police found bolt cutters, gloves, and flashlights in the vehicle—items that could give rise to an inference that John, Jonathan, and Appellant planned the burglary. Additionally, though Jonathan testified that they proceeded through the drive-through at the restaurant rather than eating inside, the police did not find any trash from the fast-food restaurant in the vehicle. As in *Oliver,* although this evidence does not constitute direct evidence of an agreement, the facts and circumstances are susceptible to the reasonable inference that Appellant conspired to commit the unlawful acts. Ample evidence exists from which a jury could infer either an express

plan, or a tacit, mutual understanding to commit the burglary. Accordingly, the trial judge's ruling is affirmed.

### IV. Coercion/Duress

In *State v. Robinson,* 294 S.C. 120, 363 S.E.2d 104 (1987), the South Carolina Supreme Court explained the defense of coercion:

> To excuse a criminal act, the degree of coercion must be present, imminent, and of such a nature as to induce a well-grounded apprehension of death or serious bodily harm if the act is not done. Coercion is no defense if there is any reasonable way, other than committing the crime, to escape the threat of harm. The fear of injury must be reasonable.

*Id.* at 121–22, 363 S.E.2d at 104 (citations omitted). Similarly, in *State v. Benjamin,* 345 S.C. 470, 549 S.E.2d 258 (2001), our supreme court provided the following definition of duress:

> To establish duress which will excuse a criminal act, the degree of coercion must be present, imminent, and of such a nature as to induce a well-grounded apprehension of death or serious bodily harm if the act is not done. Coercion is no defense if there is any reasonable way, other than committing the crime, to escape the threat of harm. The fear of injury must be reasonable.

*Id.* at 474 n. 3, 549 S.E.2d at 260 n. 3. "Coercion and duress envision a third person compelling another by threat of immediate physical violence to commit a crime against someone else or someone else's property." *State v. Holliday,* 333 S.C. 585, 588, 510 S.E.2d 436, 438 (Ct.App.1998) (citations omitted).

Our review of this record convinces us that the evidence in regard to coercion and duress is de minimis. Additionally, the issues of coercion and duress were factual issues to be decided by the trial jury.

### *CONCLUSION*

For the reasons stated herein, the trial court's decision is **AFFIRMED.**

STILWELL and SHORT, JJ., concur.