**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

The State, Respondent,

v.

Quavon Deshay Edmunds, Appellant.

Appellate Case No. 2022-001618

———————

Appeal From Greenville County
Edward W. Miller, Circuit Court Judge

———————

Unpublished Opinion No. 2025-UP-261
Submitted April 1, 2025 – Filed July 23, 2025

———————

**AFFIRMED**

———————

Elizabeth Anne Franklin-Best, of Elizabeth
Franklin-Best, P.C., and Jillian Marie Lesley, of Cromer
Babb & Porter, LLC, both of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant
Attorney General Joshua Abraham Edwards, both of
Columbia, and Solicitor Cindy S. Crick, of Greenville; all
for Respondent.

———————

**PER CURIAM:** Appellant Quavon Deshay Edmunds appeals his convictions of
two counts of attempted murder, possession of a weapon during the commission of

a violent crime, unlawful discharge of a firearm, and criminal conspiracy. Edmunds contends the trial court erred in charging the jury on accomplice liability and in failing to grant his motion for directed verdict. We affirm.

## FACTS

On February 7, 2018, Frederick Miller-Knowles, the victim, was driving with his girlfriend, Jaton Lomax, when he was shot in the head three times. The shots were fired from a blue Camaro stopped next to Miller-Knowles at a red light. Miller-Knowles survived but sustained severe injuries to his face and jaw. Lomax was not injured.

Earlier that morning, Miller-Knowles and his buddy, Lee Moss, decided to go get some weed. They drove to Edmunds's house in Moss's red Infinity. When they arrived at Edmunds's house, someone was in the yard, and the two left without their intended contraband. After driving away, according to Miller-Knowles, Moss stated out of the blue he wanted to rob Edmunds. So, Miller-Knowles and Moss returned to Edmunds's house and stole "marijuana, a puppy, a game system, a [firearm], some jewelry and some shoes." Miller-Knowles, still in the red Infinity, drove Moss home, dropped him off, and then picked up his girlfriend to take her to work. Around this time, Miller-Knowles got a call from a friend who told him "[Edmunds] and them had just rolled through looking for us." Miller-Knowles was then shot at a red light.

A school bus driver who was at the red light when the shooting occurred testified she saw someone shoot from one car into another. She claimed the shots were fired by a "gloved hand" that came out of the passenger window of a blue Camaro but she could not see the driver or the shooter. Footage from the school bus was played for the jury at trial.[1] The video begins with a silver car speeding past the school bus and stopping behind a red car in the right lane at a stop light. It then shows shots being fired at the red car from the passenger window of a dark car in the left lane. The red car veers off the road, coming to a stop in a parking lot, and the silver car turns right at the light. As the school bus begins to move forward, two black cars cut across the right lane, in front of the bus, to follow the silver car.

William Godfrey, a lieutenant at a fire department located near the incident, was in the station's parking lot when the shooting occurred. He testified he heard

---

[1] Every school bus in Greenville County is equipped with a video camera that begins to record when the ignition is turned on.

gunshots, then turned towards the red light and saw a car veer off the road. He further testified he saw two Camaros[2] and a dark Impala "speeding off." Godfrey and others from his department quickly headed across the street to render aid. Godfrey claimed he saw a black Impala "return to the scene" and then heard police sirens, at which point the car sped away. He informed law enforcement about the Impala, and a chase ensued. When the Impala was apprehended near the scene, inside were Damous Beasley, the driver, Curtis Collins, the front seat passenger, and Jaquin Dodd, the backseat passenger. Police also found a gun belonging to Collins underneath the front passenger seat. All three men were detained and transported to the police station; all were charged with conspiracy and attempted murder and pled guilty to accessory after the fact and criminal conspiracy.

Meanwhile, in a neighborhood near the intersection where the shooting occurred, Wendy Arnold noticed two men walking down a hill. One started running, so she followed him in her car. At trial, she testified there were "two dark-brown-skinned guys," one who was "thin and had a hat on" and one who was "heavyset" with "dreads or braids and gold tips on the ends of his hair." A police investigator testified this latter description matched Edmunds's appearance at the time of the shooting. Arnold explained that when she turned the corner and saw police cars, she called 911 to report what she had seen. When she got to her house, there was a dark car parked at the bottom of her driveway. She called 911 again to let them know about the car. At trial, she identified this car as a blue Camaro, although she initially told police it was a Charger. She further testified that another dark car—she thought it was a Cadillac—pulled up next to the parked one. A man got out of the Cadillac and into the driver's seat of the parked car. According to Arnold, the police then arrived and surrounded the car on all sides, at which point the man tried to run. Police would later identify this man as Xavier Concepcion, who owned the blue Camaro. Arnold confirmed Concepcion was not one of the two men she noticed earlier. Concepcion was charged with attempted murder, conspiracy, and accessory after the fact, and these charges were still pending when Edmunds's trial occurred.

---

[2] Firefighters alerted police officers about a black Camaro they witnessed speeding away from the shooting. Officers located the vehicle not far from the scene. The driver, Justin Miller, took off running and was eventually arrested. Miller pled guilty to accessory after the fact and criminal conspiracy after being charged with conspiracy and attempted murder.

Russel Irvin, a sergeant in the Violent Crimes Investigation Unit at the Greenville City Police Department, responded to the shooting. After interviewing Beasley, Collins, Concepcion, Dodd, and Miller, and reviewing Arnold's witness statement, Sergeant Irvin obtained a warrant for Edmunds's arrest. A few days later, Sergeant Irvin spoke with Miller-Knowles in the hospital. Miller-Knowles's jaw was wired shut, but he wrote on a notepad that the man who shot him was Edmunds. However, Miller-Knowles later changed his story, admitting he did not see Edmunds shoot him and had only been told that Edmunds was looking for him. Further, while Miller-Knowles initially denied being at Edmunds's house the morning of the shooting, he later admitted—both to police and at trial—that he and Moss had committed the burglary that morning.

Edmunds turned himself in to police on February 21, 2018, at which point he was arrested and charged. Edmunds was indicted for two counts of attempted murder, possession of a weapon during commission of a violent crime, unlawful discharge of a firearm, and criminal conspiracy. The case proceeded to a jury trial from November 7–9, 2022. At trial, as discussed above, the jury heard testimony from the school bus driver and watched the video of the shooting. The jury also heard testimony from Miller-Knowles, Lomax, Godfrey, and Arnold, among others. Notably, the four co-defendants who pled guilty—Beasley, Collins, Dodd, and Miller—all testified at trial.

Dodd testified he knew Collins and Beasley, and he got a call the morning of the shooting informing him that Beasley had been robbed. He claimed he, Beasley, and Collins got into a black Impala and went "driving around," and that they eventually got pulled over. He stated he did not see or hear the shooting. Further, he confirmed he remembered acknowledging as part of his guilty plea "there was a coordinated effort among several cars that surrounded the victims before shots were fired." However, on cross, he claimed "none of that happened."

Collins, Beasley's cousin, testified Beasley called him the morning of the shooting and asked him to come to Edmunds's house because someone had broken into it. Collins claimed that when he got to the house, he and others discussed getting the stolen items back, "but it wasn't like a crime was going to be committed." He testified he thought "they were going to hand it over back willingly," though he confirmed he brought a gun along. According to Collins, Edmunds was at the house when he arrived, but he "didn't see him after that." Collins claimed he did not talk to Edmunds about what they were doing because Edmunds was not his "friend." Collins further described "riding around" in Beasley's black Impala, and he stated he saw two Camaros but did not know who was driving either one. He also claimed he

did not see or hear the shooting and had no idea who was in the blue Camaro. He did, however, confirm the Impala was pulled over by law enforcement and that he was taken into custody and questioned.

Miller knew Edmunds from work. Miller testified the two left work together and went to Edmunds's house to play video games, which is when they discovered the break-in. Miller claimed that, after watching a video of the break-in, he went home to eat and then drove alone in a black Camaro to meet up with Edmunds. When asked what prompted him to go to the gas station, he stated "it was just talked about before I left," and that he heard it from Beasley first. At trial, he testified he was just meeting Edmunds. But in a recorded statement to police—portions of which were played to the jury—he claimed there were multiple cars involved. In another clip played for the jury, Miller told police "[Edmunds] and them was mad so . . . we were riding around looking for [Miller-Knowles]." However, he testified no one talked about shooting anybody or conspired to do anything illegal. Further, although he testified he did not talk to Edmunds on the phone from his car, he told police that Edmunds called him and told him he was "lagging behind." Miller admitted he was on the road where the shooting occurred when it happened and was eventually detained by police after trying to run.

Beasley was living at Edmunds's house when the robbery occurred. In a recorded statement played in part for the jury, he claimed that Edmunds knew Moss had robbed them and that Edmunds told Beasley to "go get your stuff back." Beasley testified at trial he could not remember this conversation but claimed he and Edmunds discussed finding the person who robbed them. When asked who went looking for the person responsible for the break-in, he responded "I mean, everybody. You know who did it." He admitted to driving the black Impala the day of the shooting and that Collins and Dodd were with him. He testified Miller was in a black Camaro, but he was not sure what car Edmunds was in. Yet in his recorded statement, he explained that initially, Edmunds and Concepcion were in Concepcion's blue Camaro and Concepcion was driving, and at some point, Concepcion got out of his Camaro and into a silver Mercedes; someone else got into the Camaro. However, Beasley consistently testified he was not sure if Edmunds was ever in the blue Camaro and he was unsure who ended up driving it.

In addition to the co-defendants, the jury heard from Tim Harrison, an intel officer with the Greenville Police Department whom the State presented as an expert to testify about cell site location information (CSLI) obtained from Edmunds's phone. Harrison testified that, using a software called GeoTime, he can plot CSLI data to "visually see . . . where the phone was or has been." Harrison explained that

CSLI and GeoTime give a "general area, not an exact location for the phone."  He then walked the jury through a report he generated in GeoTime and opined "the defendant's cell phone was in the sector covered by the shooting incident at the time of the shooting."

Sergeant Irvin testified about what he learned during the course of his investigation, summarizing most of the information described above.  After this, the State rested, and Edmunds moved for a directed verdict, but the court denied the motion.  Edmunds then presented his grandmother as an alibi witness.[3]  The defense rested and then Edmunds renewed his motion for a directed verdict, which the court denied.  The jury returned a guilty verdict on all charges, and Edmunds was sentenced to twenty-five years' imprisonment for each count of attempted murder, five years' imprisonment for possession of a firearm, ten years' imprisonment for unlawful discharge of a firearm, and five years' imprisonment for criminal conspiracy, to be served concurrently.  This appeal followed.

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only." *State v. Wilson*, 345 S.C. 1, 5, 545 S.E.2d 827, 829 (2001).  "We are bound by the trial court's factual findings unless they are clearly erroneous."  *Id.* at 6, 545 S.E.2d at 829.

## LAW AND ANALYSIS

### I.    Accomplice Liability

"The law to be charged must be determined from the evidence presented at trial." *State v. Weatherall*, 431 S.C. 485, 498, 848 S.E.2d 338, 345 (Ct. App. 2020) (quoting *State v. Cole*, 338 S.C. 97, 101, 525 S.E.2d 511, 512 (2000)).  "If any evidence supports a charge, it should be given." *State v. Perry*, 434 S.C. 92, 99, 862 S.E.2d 451, 454 (Ct. App. 2021), *rev'd on other grounds*, 440 S.C. 396, 892 S.E.2d 273 (2023).  Under the "hand of one is the hand of all" theory for accomplice liability,

---

[3] During Harrison's CSLI testimony, he testified that Edmunds's cell phone did not connect with a tower near the grandmother's home until several hours after the shooting.

when two people join together to commit a crime, and during the commission of that crime one of the two commits another crime, both may be criminally liable for the unplanned crime if it was a natural and probable consequence of their common plan to commit the initial crime.

*Butler v. State*, 435 S.C. 96, 97–98, 866 S.E.2d 347, 348 (2021). "It is axiomatic that a conspiracy may be proved by direct or circumstantial evidence or by circumstantial evidence alone." *State v. Condrey*, 349 S.C. 184, 192–93, 562 S.E.2d 320, 324 (Ct. App. 2002). Co-conspirators "need not all be indicted or named;" it is sufficient if an agreement may be inferred between the defendant and "other persons unknown." *See State v. Crawford*, 362 S.C. 627, 638, 608 S.E.2d 886, 892 (Ct. App. 2005).

To support an accomplice liability charge when shots are fired during the commission of another crime, "the question is whether there is any evidence that another co-conspirator was the shooter and [the defendant] was acting with him when the [criminal act] took place." *Barber v. State*, 393 S.C. 232, 237, 712 S.E.2d 436, 439 (2011). "Like a lesser-included offense, an alternate theory of liability [such as accomplice liability] may only be charged when the evidence is equivocal on some integral fact and the jury has been presented with evidence upon which it could rely to find the existence or nonexistence of that fact." *Id.* at 236, 712 S.E.2d at 439. "Accomplice liability can be proven by circumstantial evidence." *State v. Campbell*, 443 S.C. 182, 193, 904 S.E.2d 441, 446 (2024); *see also State v. Johnson*, 444 S.C. 442, 451, 908 S.E.2d 102, 106 (2024) (quoting *Campbell* for the same proposition).

### A. Mutual plan or agreement

Here, there was sufficient circumstantial evidence that Edmunds joined together with his co-defendants to commit a crime. The State presented evidence of a scheme involving seven men—two of whom had been robbed by the victim that morning—at least four cars, and at least two guns. Video footage shows the victim's car stopped in the right lane at a red light; a silver car speeding through a red light to stop behind the victim's car; shots being fired from a blue Camaro in the left lane next to the victim's car; and two black cars immediately speeding away. Arnold testified she saw two men in her neighborhood near the shooting. One of them, who matched Edmunds's description, began running when her car approached. Minutes later, Arnold saw a man who got into a dark car near her driveway and then tried to

run when police surrounded him. She later identified the car as a blue Camaro, and the man inside was Concepcion.

These facts suggest that Dodd, Collins, Miller, Concepcion, Beasley, and an unnamed individual joined together to commit some crime, and at the least, Collins and someone in the blue Camaro were armed. From these circumstances: (1) a jury could infer the men agreed to reclaim personal property and to use force if necessary;[4] or (2) a jury could infer the men agreed to track down and shoot the victim. If the intent was not to shoot and kill Miller-Knowles, the shooting was a natural and probable consequence of a plan to bring guns along in an attempt to reclaim stolen property. Either way, the State presented sufficient circumstantial evidence that the co-defendants joined together to commit a crime.

### B. Evidence that co-conspirator was the shooter

Once evidence of an agreement to commit a criminal act has been established, the next question is whether anyone other than the defendant could have been the shooter. If there is no evidence that anyone other than the defendant could have been the shooter, the defendant is either guilty as the principal or not guilty, and an instruction on accomplice liability would not be warranted.

This case bears resemblance to *State v. Johnson*. 444 S.C. 442, 908 S.E.2d 102 (2024). In *Johnson*, the defendant was convicted of murdering Akeem Smalls. *Id.* at 445, S.E.2d at 103. At trial, a witness testified Smalls owed Johnson money and Johnson was "looking for" Smalls. *Id.* at 447, 908 S.E.2d at 104. The State presented video footage of two men arriving at an apartment complex in a blue Toyota Camry and walking towards a building where the victim's girlfriend resided. *Id.* at 446, 908 S.E.2d at 104. The video shows the same two men leaving the building two minutes later and rushing back to the Camry. *Id.* Moments after, the victim—who had been shot and later died from the wound—is seen running out of the building. *Id.* Johnson admitted to investigators that he was driving the Camry in the video[5] and claimed the passenger was a man named "Creep," who was never

---

[4] *See State v. Harry*, 420 S.C. 290, 299–301, 803 S.E.2d 272, 277 (2017) (holding the State presented evidence, sufficient to survive a directed verdict, that "Petitioner's presence at the scene of the shooting [was] a result of a prior arranged plan to undertake an illegal act, if necessary, to retrieve [personal property]").

[5] The State presented evidence to corroborate this admission, including an unfired bullet cartridge (of the same type as the bullet that killed Smalls) found in Smalls's girlfriend's apartment with Johnson's fingerprint on it, Johnson's fingerprints inside

identified. *Id.* Our supreme court noted, "These facts make out an unassailable case for murder—with one exception: the State could not conclusively prove it was Johnson who pulled the trigger . . . ." *Id.* at 449, 908 S.E.2d at 105. However, the supreme court held this did not matter under a theory of accomplice liability, stating:

> If Johnson was the shooter, he was clearly guilty of murder as the principal and there is no need for any discussion of accomplice liability. The accomplice liability question arises only on the possibility that Creep was the shooter instead of Johnson. Thus, the narrow question before us is whether a reasonable inference could be drawn from the evidence that Creep shot Smalls pursuant to a plan or agreement with Johnson. We hold the evidence reasonably supports that inference.

*Id.*

Here, the State presented circumstantial evidence that Edmunds and an unnamed individual were in the blue Camaro, and video footage clearly shows shots being fired from the blue Camaro. Just like in *Johnson*, the evidence of the identity of the shooter was "equivocal." *Id.* at 451–52, 908 S.E.2d at 107 (discussing the court's use of the term "equivocal" in its opinion in *Barber*). In other words, a reasonable inference could be drawn from the evidence that either Edmunds or the unnamed individual shot Miller-Knowles pursuant to a plan or agreement. The State's primary theory at trial was that the unnamed individual was driving and Edmunds fired the shots from the passenger seat. However, the evidence that puts Edmunds in the Camaro was Beasley's statement to police, and he claimed he did not know whether Edmunds was the driver or the passenger. Thus, the evidence is "equivocal on some integral fact," that fact being who actually fired the shots. *Barber*, 393 S.C. at 236, 712 S.E.2d at 439. The evidence reasonably supports an inference that Edmunds was driving and the unnamed individual was the shooter. Because the jury heard evidence that Edmunds could have been the shooter or the driver, an accomplice liability instruction was warranted.

### C. Language of the charge

---

the Camry, and cell site location data that placed Johnson in the vicinity of the murder when it occurred. *Johnson*, 444 S.C. at 446–47, 908 S.E.2d at 104.

Edmunds argues the language of the accomplice liability charge was improper because it "included an example mirroring the alleged facts of the case and was therefore essentially a charge on the fact[s]."[6] This argument is unpreserved. "[T]he parties shall be given the opportunity to object to the giving or failure to give an instruction before the jury retires . . . . Failure to object in accordance with this rule shall constitute a waiver of objection." Rule 20(b), SCRCrimP. "[A] party must object at the first opportunity to preserve an issue for review. A contemporaneous objection is required to preserve an issue for appellate review." *State v. Aldret*, 333 S.C. 307, 312, 509 S.E.2d 811, 813 (1999) (citations omitted).

Here, Edmunds objected to the State's request for an accomplice liability charge during the charge conference. The court overruled the objection, finding there was evidence in the record to support the charge, and ultimately charged the jury on accomplice liability. At the conclusion of the charges, the court asked if either party had any exception or objection, and Edmunds stated he did not. During deliberations, the jury asked for clarification about conspiracy and the hand of one is the hand of all, and the court recharged them on conspiracy and accomplice liability using the same language as before. At this point, Edmunds objected to the language of the charge, arguing the example too closely resembled the facts of the case.[7] Because Edmunds did not object to the language of the charge until after the jury began its deliberations, and because he did not make a contemporaneous

---

[6] The court gave the following instruction on accomplice liability:

> Now, if a crime is committed by two or more people who are acting together in committing a crime, the act of one is the act of all. A person who joins with another to accomplish an illegal purpose is criminally responsible for everything done by the other person which occurs as a natural consequence of the acts done in carrying out the common plan and purpose. For example, two people can be guilty of killing another person when only one of the two had a gun, there was only one bullet, and only one of the two fired the shot that caused the death. If two or more people are together, acting together, assisting each other in committing the offense, the act of one is the act of all, or as it's sometimes said, the hand of one is the hand of all.

[7] Edmunds acknowledged he "should have [objected] when [the court] charged them the first time," and the court noted the objection for the record.

objection at the first opportunity, the issue is unpreserved. In any event, the example in the charge could apply to many different circumstances and thus, its general nature does not constitute a charge on the facts.

## II.    Directed Verdict

"On appeal from the denial of a directed verdict, [appellate courts] view[] the evidence and all reasonable inferences in the light most favorable to the State." *State v. Butler*, 407 S.C. 376, 381, 755 S.E.2d 457, 460 (2014). "If there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the [appellate court] must find the case was properly submitted to the jury." *Id.* (quoting *State v. Weston*, 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006)); *State v. Bennett*, 415 S.C. 232, 236–37, 781 S.E.2d 352, 354 (2016) (finding that a trial court "must submit the case to the jury if there is 'any substantial evidence which reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced." (quoting *State v. Littlejohn*, 228 S.C. 324, 329, 89 S.E.2d 924, 926 (1955))).

Edmunds takes issue with the lack of direct evidence in this case. For example, he argues "no one testified that Edmunds was the shooter in the blue Camaro or even confirmed he was in the blue Camaro," and "no forensic evidence [placed] Edmunds in the blue Camaro." However, both conspiracy and accomplice liability can be proven through circumstantial evidence. *Condrey*, 349 S.C. at 192–93, 562 S.E.2d at 324 ("It is axiomatic that a conspiracy may be proved by direct or circumstantial evidence or by circumstantial evidence alone."); *Campbell*, 443 S.C. at 193, 904 S.E.2d at 446 ("Accomplice liability can be proven by circumstantial evidence.").

Here, there was substantial circumstantial evidence reasonably tending to prove Edmunds was guilty either as the principal or as an accomplice. Regarding attempted murder and the gun-related charges, the jury saw a video of the shooting that clearly indicates shots were fired from a blue Camaro. While Beasley testified at trial he could not recall if Edmunds was in the Camaro, the jury heard him tell police in a recorded statement that Edmunds *was* in the Camaro. It was up to the jury to weigh these inconsistent statements. *See Crawford*, 362 S.C. at 634, 608 S.E.2d at 890 ("[T]he contradiction between [a witness's statement] to police and his later testimony in court is a matter of weight for the jury to decide."). Further, the State presented CSLI that put Edmunds's cell phone in the vicinity of the shooting at the time of the shooting.

Regarding conspiracy, the jury heard testimony from four co-defendants who all described, in some way or another, meeting up, getting into various cars, and driving around to either look for the person who committed the robbery or to retrieve the stolen items. At least two of these men—Collins and the shooter in the Camaro—brought guns along. Even though all four co-defendants testified they never discussed committing a crime and never planned on shooting or killing anyone, there is clearly evidence of an agreement to do *something illegal*. The video evidence alone, particularly the coordinated manner in which the cars can all be seen fleeing the scene, suggests there was some sort of mutual plan. Even if murder or attempted murder was not part of the plan, Edmunds is nonetheless guilty of conspiracy so long as the shooting was a "natural and probable consequence" of a "common plan to commit [an] initial crime." *Butler*, 435 S.C. at 97–98, 866 S.E.2d at 348. As discussed above, there was substantial circumstantial evidence that the men either planned to track down and shoot Miller-Knowles or retrieve their stolen items using force if necessary, evidenced by the guns they brought with them. Either way, there is sufficient evidence of an agreement to commit a crime.

In sum, we hold the trial court did not err in denying Edmunds's motion for a directed verdict because, in viewing the evidence in the light most favorable to the State, there was substantial circumstantial evidence from which Edmunds's guilt could be fairly and logically deduced.

## CONCLUSION

For the foregoing reasons, the trial court's order is

**AFFIRMED.**[8]

**WILLIAMS, C.J., and GEATHERS and TURNER, JJ., concur.**

---

[8] We decide this case without oral argument pursuant to Rule 215, SCACR.